### J. J. LLOYD v. R. J. BOWEN.

(Filed 10 November, 1915.)

**1. Negligence—Runaway Horse—Trials—Evidence—Questions for Jury.**

In an action to recover damages for a personal injury alleged to have been caused to the plaintiff by a runaway horse, there was evidence tending to show that the defendant tied his spirited horse, four years of age, knowing its habits and disposition, to a dead limb of a tree, in an open space in a populous business portion of the town, in full view of a street, and left him there all day without food and attention; and that about 3 o'clock in the afternoon, after the horse had several times shown restlessness and tried to break away, he broke off the dead limb and ran away through the cleared space to the street and upon the plaintiff, causing the injury alleged: *Held,* the previous knowledge of

---

LLOYD *v.* BOWEN.

---

the defendant as to the disposition of the horse, and the external appearance of the limb, or the impression made upon him at the time as to its reliability, are but details of the evidence, which taken together in its several aspects was sufficient to carry the case to the jury, under the application of the rule of the prudent man. The question as to whether it was necessary for the defendant to have had previous knowledge of the disposition of the horse, discussed by WALKER, J.

### 2. Same—Requested Instructions—Appeal and Error.

Where damages for a personal injury are sought in an action upon the alleged negligence of the defendant in tying his spirited four-year-old horse in an open space in the populous portion of the city, to the dead limb of a tree and leaving him there all day, a requested instruction making the defendant's liability depend upon his previous knowledge and the appearance of the limb to which he tied him is too restricted in its scope, and objectionable as confining the answer of the jury to matters relating to only one phase of the case, when there are several upon which the defendant's actionable negligence may be founded. ·

### 3. Negligence—Runaway Horse—Trials—Instructions.

Where the negligence alleged in an action to recover damages for a personal injury inflicted by a runaway horse, with evidence to support it, is that the defendant tied his young and restless horse to a dead limb of a tree in a populous portion of the city, and left him there, an instruction to the jury is proper that to constitute negligence it was not required that the defendant should have been able to foresee that by his conduct the injury would result to the plaintiff exactly as it did, but if he reasonably could have foreseen that injury would result to some one, it was sufficient. *Drum v. Miller*, 135 N. C., 204, cited and applied.

### 4. Negligence—Instructions—Proximate Cause.

Where the charge of the court to the jury is excepted to on the ground that it did not define the doctrine of proximate cause in a proper case, or that it improperly left out this element to the appellant's prejudice, the charge will be construed as a whole, and there is no reversible error when it appears in several parts of the charge that the judge instructed the jury that they must not only find that there was negligence on the defendant's part, but also that it must have caused the injury, and that the jury could not have been misled by the charge.

APPEAL by defendant from *Cline, J.,* at June Term, 1915, of FORSYTH.

Civil action tried before *Hon. H. R. Starbuck, judge,* and a jury, in Forsyth County Court at its June Term, 1915, taken by appeal of defendant to the Superior Court, on matters of law, and heard by *Hon. E. B. Cline, judge presiding,* at September Term, 1915, of Forsyth Superior Court, when the judgment upon a verdict in favor of the plaintiff for $500 was affirmed and an appeal taken by defendant to this Court.

The plaintiff, on 8 February, 1915, was walking on the sidewalk of Main Street in Winston-Salem, when he was knocked down and seriously injured by a runaway horse owned by the defendant. He brought his suit 29 April following in the Forsyth County Court to recover damages for the injuries he had sustained. The specific allegations of negligence in the complaint are, in effect, that defendant was negligent in that he tied his horse to the dead limb of a tree in an open space, unprotected

by fencings or railings, near Liberty Street, which was a populous and a much traveled street; that after tying him at this place, he permitted him to remain standing there nearly all day without food, care or attention, and, it being a cold day, the horse became excited or restless, broke this dead limb and ran away.

There was evidence to the effect that the horse was a high-spirited animal, only about four years old, and had been brought in from the farm of the defendant on that morning and left standing in.front of defendant's stables, hitched to a dead limb within a hundred feet of Liberty Street and in plain view of that street, without any barrier or fencing between the horse and the street. It was also in evidence that the horse had stood there all day and until the afternoon, without any food, care or attention; that for several hours previous to his breaking this dead limb he was rearing and jumping and kicking up his heels, trying to break loose. His actions attracted the attention of the clerks at work in the postoffice, about a block distant. At about 3 o'clock in the afternoon the horse pulled on his halter, which broke the dead limb from the tree, and he ran away, crossing the open space in this vacant lot to Liberty Street; then he crossed Liberty Street, and went through a vacant space in the next block to Main Street, where he struck the plaintiff. The plaintiff sustained painful and serious injuries; he was picked up from the street in a practically unconscious condition, and was taken in an automobile to the hospital, and upon examination by the physicians it was found that about four of his front teeth were knocked out and he was cut and bruised on his body—several of the cuts were in his face.

The plaintiff, J. J. Lloyd, testified: "I had a conversation with Mr. Bowen after the injuries. Mr. Bowen said that his horse was a high-spirited horse and had been standing there all the morning without anybody looking after it, and that, it being a little cool, he was full of life. He just broke the limb and ran away. He said the horse had been brought from his farm and hitched there that morning. He said he had not been fed. It was a chilly day in February."

C. E. Hamilton, witness for plaintiff, testified: "On 8 February my attention was called directly to this horse. He was just playing and kicking and running around and rearing; just playful, is all I can say. I could not say how.long he had been standing hitched there. The first time I noticed him that day was about 1 o'clock in the afternoon. I had not noticed him before, as my work in the morning is in the front part of the postoffice, and in the afternoon my work is in the back of the postoffice. I do not know how he was hitched to the tree. I saw him when he broke loose. I was standing in the back door of the postoffice. The horse was playing and rearing and kicking up, and at that time I saw him break loose and I heard the limb pop, and he dashed across

the roadway and almost stopped, as the limb was hanging to the reins,. and when the limb hit the ground it seemed to scare him, and he ran then as hard as he could go, and he ran through the alley by the postoffice. I did not see what happened on Main Street. I took it to be a dead limb that he was hitched to, as it had that appearance. It popped like a dead limb when it broke off, and it looked like a dead limb as the horse went by the alley."

The defendant testified for himself that he did not have the conversations with the plaintiff and his wife, as they stated on the stand, and he did not tell them, or anybody, what they had so stated, or any of it. That the horse was four years old, but not high spirited and rather lazy, and so gentle that ladies could ride him. He had a blanket on him the day he was hitched to the limb. It was a cold day. He had not been used very much. Witness did not tie him. The horse was hitched 100 feet from Liberty Street, but there was a large house between him and the street, which cuts off the view from the street and a horse stable cuts it off from the north.

There was evidence on the part of defendant that the limb was green and sound and the horse was hitched "high up" to prevent him from rubbing his mane.

There was much other evidence for the respective parties of a similar kind.

*Louis M. Swink for plaintiff.*
*Frank T. Baldwin and Lindsay Patterson for defendant.*

WALKER, J., after stating the case: The first three prayers for instruction involved substantially the rule of the prudent man, and from a careful inspection of the charge it appears that it was fully responsive to them. It makes no difference in what form a request for instructions is given, or with what particular language it is expressed, the judge is not bound to adopt the words of counsel, but may choose his own, provided he does not thereby weaken the force of the instructions which are requested to be given. If he gives them in substance, though not with literal conformity, it will be quite sufficient, as we have so often held. *Chaffin v. Mfg. Co.,* 135 N. C., 95; *Wilkie v. R. R.,* 127 N. C., 203; *Cox v. R. R.,* 126 N. C., 103; *Mitchell v. Corpening,* 124 N. C., 472. We said in *Chaffin's case, supra:* "The plaintiff cannot insist that the court should have given these instructions in the very language employed in framing them. It is a sufficient response to prayers if the court, in its own words, chosen, perhaps, so as not to do any injustice to either side, gives the instructions substantially, provided that the party who asks for them will have the full benefit of the principles of law he seeks to have applied to the facts." And in *Baker v. R. R.,* 144 N. C., 36: "It is also true that the court is not obliged to adopt

the very words of an instruction, asked to be given, provided, in respond-ing to the prayer, it does not change the sense or so qualify it as to weaken its force," citing *Brink v. Black*, 77 N. C., 59.

The court correctly defined negligence and proximate cause, and also properly applied the rule of the prudent man to the facts as the jury might find them to be. The question of negligence in regard to the horse did not depend, in this case, solely upon defendant's previous knowledge of his vicious or unruly habits. It would be a circumstance to be weighed with others disclosed by the evidence.

The fourth prayer, as to the external appearance of the limb, and the impression made upon the defendant concerning its strength and relia-bility, and as a proper one for the purpose of hitching the horse to it, was but a detail of the evidence and was fully embraced by the instruc-tion given. Besides, it was too restricted for the conclusion drawn from it by defendant in the prayer that the first issue should be answered "Yes." There were other important considerations entering into the question of negligence.

The instruction which is the subject of the fifth exception was correct in itself. It merely stated the principle of *Drum v. Miller*, 135 N. C., 204, that, in order to constitute negligence, it was not required that defendant should have been able to foresee that by his conduct the injury would result to plaintiff exactly as it did, but if he could reasonably foresee that injury would result to some one, it was sufficient; and as to the objection that the court omitted to charge as to the proximate cause in this instruction, but made an affirmative answer to the first issue depend solely upon a finding that there was negligence, it may be said that the court had twice, if not oftener, told the jury in direct and ex-plicit language that they must not only find that there was negligence on the part of the defendant, but that it caused the injury to the plain-tiff, and they could not have been misled by it. The charge must be viewed as a whole and according to its context. *Everett v. Spencer*, 122 N. C., 1010; *Westbrook v. Wilson*, 135 N. C., 402; *Aman v. Lumber Co.*, 160 N. C., 374; *McNeill v. R. R.*, 167 N. C., 390. His Honor's defini-tion of an accident was the approved one. *Crutchfield v. R. R.*, 76 N. C., 320; *Raiford v. R. R.*, 130 N. C., 598; and it was correctly applied to the facts and distinguished from negligence.

In regard to the liability of owners of animals for injuries committed by them, Judge Thompson thus states the governing principles: "The tendency of the modern law to assimilate the liability of the owner of domestic animals for injuries committed by them to negligence in all cases, without reference to proof of knowledge of a vicious propensity in such animals, is illustrated in a large class of holdings, some of them ancient, which, however, relate chiefly to damage done by escaping horses, cattle, etc. The result of these holdings may be substantially

stated to be that the liability of a keeper of horses, cattle, etc., for allowing them to escape upon the public streets, in case they there do damage to travelers or others lawfully upon the streets, does not rest upon any conception of the vicious character of the animals, but rests upon the question whether the keeper was guilty of negligence in permitting them to escape. And here the same rule in regard to what is and what is not negligence obtains as in most other situations. It is the legal duty of every person having charge of an animal to apportion the care with which he uses it to the danger to be apprehended from a failure to keep it constantly under control. He must use such care as is demanded by the circumstances which he knows or may reasonably believe surround him." 1 Thompson Negligence, sec. 849, and cases cited.

We understand *Judge Thompson* to mean that knowledge by the owner of the vicious propensities of his horse is not always essential to a recovery in an action for injuries alleged to have been caused by the owner's negligence. There may be negligence apart from this, but if the owner is not otherwise negligent and the injury is caused by the viciousness of the horse, then knowledge must be shown in order to charge the owner; but where there are other circumstances tending to show negligence, knowledge of the animal's habits or propensities, or the want of it, may be considered in connection with them. The owner, of course, will not be allowed to plead ignorance when by the exercise of ordinary care he could have acquired the requisite knowledge. But, at last, it all comes to the question of ordinary care and the rule of the prudent man, and no general rule applicable to all cases, other than the one just mentioned, can well be laid down. In this case, though, we need not decide these questions, as there is ample evidence, we think, that the defendant had knowledge of the disposition and habits of this animal, although there was some evidence to the contrary.

We are not inadvertent to the principle declared in *Spring Co. v. Edgar,* 99 U. S., 645 (25 L. Ed., p. 487, note and cases cited), but there were some facts and circumstances in that case which are not to be found in this record. There was evidence of negligence here apart from the question of knowledge of the peculiar characteristics of the horse, inclining him to be breachy, unruly or dangerous. When the case of *Spring Co. v. Edgar, supra,* is properly considered, it will be found to sustain the views herein stated, for we do not understand that case to hold that knowledge of the habits of the animal is necessary to be shown where there is negligence in the management or control of the animal which caused the injury. But whatever it decides, the evidence in this case brings it well within the principles there applied.

The case was correctly tried and there is no ground for a reversal.

No error.