### MRS. SAM RECTOR, ADMX., v. SOUTHERN COAL CO.

(Filed 31 December, 1926.)

**Negligence—Animals—Master and Servant—Employer and Employee—Evidence—Nonsuit.**

Where the evidence tends only to show that the plaintiff, an employee of the defendant, was experienced in taking care of horses and mules, was injured while in the course of his employment when entering a stall of a mule, by being caught by the animal suddenly turning around and catching him and mashing him between its rump and the side of the stall, causing the injury in suit, without evidence that the mule had by its vicious habits caused injury of this or other like kinds, or that the habits of this particular mule were more vicious than those of mules generally, or that the owner was aware of its being more than ordinarily vicious, defendant's motion for judgment as of nonsuit is properly granted.

CIVIL ACTION, tried before *Harding, J.,* at June Term, 1926, of BUNCOMBE.

The plaintiff, Sam Rector, instituted an action against the defendant for damages sustained by reason of being struck by a mule. The plaintiff died pending the action, and his wife was appointed administratrix, and came into court and adopted the complaint filed in the lifetime of her husband.

Deposition of the deceased was taken prior to his death, in which he testified: "I was employed to do most everything. I fed horses, took care of the barn, chickens, shoveled coal, sawed wood, and just general work. . . . It was my duty to gather the eggs laid by the chickens and deliver them to the Southern Coal Company's office. . . . In

April, 1924, the company had something like twelve to twenty mules.
. . . The mules were kept in the stables when they were not at
work. The stalls and stables where the mules stood were arranged to
head into each other along the walls, and when the mules were in the
stalls the back was open. In going into the stalls, it was necessary to
pass by where you had a mule in the stall. . . . In April, 1924,
the superintendent gave me orders to gather eggs for Mr. Shepherd, on
which date the coal company had a mule of vicious habits in one of its
stalls. I can't tell you now what the vicious habits of the mule were.
. . . If you touched it or went to go by it, it would whirl to get
away, and if it could, it would catch you. If you got away, you were
lucky, and if you didn't, you had to take it. It was just generally skit-
tish and scared to death all the time. . . . I told Mr. Parker (man
in charge of the stables and mules) that old mule was dangerous, and
that it would kill somebody some of these days, and he said it had no
sense. Mr. Parker told me he would try to get rid of a lot of the mules;
but I can't say whether he picked out that identical mule or not."

On the day of his injury the plaintiff was told by his foreman to see
if he could find a setting of eggs for a customer. The hens laid in all
of the stalls where the mules were kept. The plaintiff took a basket to
gather the eggs, and after going into one or two stalls, went to the stall
where the mule in controversy was.

The plaintiff testified further: "After I came to the stall and just
after I come to this one, I started in and said 'whoa,' and this vicious
mule was so quick it knocked the breath out of me. . . . It caught
me with its rump against a 4 x 4 post and my back against that post—
caught me and pinned me back and just shut my breath off. . . .
So far as my duties in taking care of horses and mules were concerned,
I knew what to do. . . . I had been familiar with the care of horses
and mules part of my life, but had not been fooling with them for
about six or seven years, but back of that time I had been. I had
worked mules on the farm most of my life, and was pretty well familiar
with mules. . . . I know that mules don't have the intelligence of
horses. . . . I don't know of any other bad or vicious act com-
mitted by the mule except the injury received by me. He nearly ran
over me two or three times before. . . . That mule had never in-
jured any other person to my knowledge. If it did injure any person
during the time I had charge of it, I don't remember. . . . It was
not necessary for me to pass by the hips of the mule in order to gather
the eggs, as I could have gone around, untied the mule, and driven it
out of the barn, but I never thought of it in that way."

Another witness for plaintiff testified that at the time Rector was
injured "this mule was in his stall jumping, and as Rector went in by

the side it jumped against him and knocked him against the wall. After Rector went out the mule was kicking at a cow in the third back stall. The mule jumped against his chest, and the hips of the mule jumped against the chest of Rector and Rector was mashed against the wall of the partition of the stable. . . . The mule was jumping, and he spoke to the mule after he started in and went up to the other side, and, as he did so, the mule's hips caught him against the wall."

Issues of negligence and contributory negligence and damages were submitted to the jury and were answered in favor of the plaintiff in the sum of $600.

From judgment rendered upon the verdict, the defendant appealed.

*George M. Pritchard and Thomas S. Rollins for plaintiff.*
*Weaver and Patla for defendant.*

BROGDEN, J.  The question of law presented by this case is, what duty does the owner of a mule owe to an employee who has charge of the mule and who goes into the stall where the mule is?

A mule is a melancholy creature. It is a *nullius filius* in the animal kingdom. It has been said that a mule has neither "pride of ancestry nor hope of posterity." Josh Billings remarked that if he had to preach the funeral of a mule he would stand at his head. Men love and pet horses, dogs, cats and lambs. These domestic animals have found their way in literature. Shakespeare said of a horse: "I will not change my horse with any that treads but on four pasterns, when I bestride him I soar, I am a hawk; he trots the air; the earth sings when he touches it." But nobody loves or pets a mule. No poet has ever penned a sonnet or an ode to him, and no prose writer has ever paid a tribute to his good qualities. He is kicked and cuffed, and beaten and sworn at, and frequently underfed and forced to work under extremely adverse conditions; yet, withal, he has a grim endurance and a stubborn courage which survives his misfortunes and enables him to do a large portion of the world's rough work.

It is a matter of common knowledge among men who know mules and deal with them, that they are uncertain, moody, and morose.

This particular mule, charged with injuring plaintiff, was referred to in the oral arugment as an "unsafe mule" and as an "unsafe tool and appliance." The idealist may dream of the day when the "world is safe for democracy," but this event will perhaps arrive long before the world will be safe from the heels of a mule.

The evidence in this case discloses that the mule of the defendant did not kick or bite or attack the plaintiff, but that as the plaintiff went behind the mule into the stall, he whirled around and his rump pressed the plaintiff against a part or partition of the stall and mashed him.

RECTOR v. COAL CO.

The liability of an owner for injuries committed by domestic animals, such as dogs, horses and mules, depends upon two essential facts:

1. The animal inflicting the injury must be dangerous, vicious, mischievous or ferocious, or one termed in the law as possessing a "vicious propensity."

2. The owner must have actual or constructive knowledge of the vicious propensity, character and habits of the animal. *Cockerham v. Nixon,* 33 N. C., 269; *Harris v. Fisher,* 115 N. C., 318; *Hallyburton v. Fair Association,* 119 N. C., 526; *S. v. Smith,* 156 N. C., 628; *Lloyd v. Bowen,* 170 N. C., 216; *Tolin v. Terrell* (Ky.), 117 S. W., 290; *Dix v. Somerset Coal Co.* (Mass.), 104 N. E., 433; *Haneman v. Western Meat Co.* (Cal.), 97 Pac., 695; *Weigand v. Atlantic Refining Co.* (Pa.), 42 Atlantic, 132.

The general rule supported by the overwhelming weight of authority is thus stated in *Hallyburton v. Fair Asso.,* 119 N. C., 526: "There was no evidence that either of the defendants, at the time the horse was entered, or at the time of permitting him to be entered or run, had any knowledge that he was wild, dangerous or untrained. Before the owner of a domestic animal can be charged for injuries inflicted by it, it must be known that the owner had knowledge of the fact that the animal was vicious or unruly." Also in *S. v. Smith,* 156 N. C., at p. 632, *Justice Walker* says: "Damage may be done by a domestic animal kept for use or convenience, but the rule is that the owner is not liable to an action on the ground of negligence, without proof that he knew that the animal was accustomed to do mischief."

The determinative inquiry, therefore, on this record is whether or not there is any competent evidence that defendant's mule was "accustomed to do mischief."

The testimony of the plaintiff is set out at length. It appears that the plaintiff testified: "I cannot tell you now exactly what the vicious habits of the mule were. . . . If you touched it or went to go by it, it would whirl to get away, and if it could, it would catch you. . . . It was just generally skittish and scared to death all the time. . . . I don't know of any other bad or vicious act committed by the mule except the injury received by me. He nearly ran over me two or three times before. . . . That mule had never injured any other person, to my knowledge. If it did injure any person during the time I had charge of it, I don't remember it." It is true that the plaintiff testified: "I told Mr. Parker that old mule was dangerous and that it would kill somebody some of these days. He said it had no sense." This statement of plaintiff was a mere declaration of a conclusion, and is not supported by his evidence, because it clearly appears that the mule had never injured any one else before or since the injury to the

808 IN THE SUPREME COURT. [192

plaintiff, and that the particular act of the mule in whirling around when the plaintiff went in the stall, was the only "bad or vicious act" committed by him. This evidence would almost amount to giving the mule a "good character."

The defendant offered no evidence, and, after viewing the evidence of the plaintiff with that liberality which the law requires, it does not appear that the act complained of was in itself a vicious act or one flowing from a "vicious propensity." This conclusion is supported by the law as declared in *Tolin v. Terrell, supra,* in these words: "In spite of the fact that there was testimony to show that this mule was of so gentle a disposition the children could play at its heels, it is a matter of common knowledge and common experience that there is no telling when or under what circumstances a mule will or will not kick. The only way to escape danger from the feet of a mule is not to go within the radius of its heels."

In *Dix v. Somerset Coal Co., supra,* the Court said: "So far as appears by the evidence there is nothing to show that before the attack upon the plaintiff the horse ever had exhibited any ugly or mischievous propensities or habits, if they existed." Also in *Haneman v. Western Meat Co., supra,* the Court said: "It does not appear that any person was ever before kicked by him. . . . In this case it is not shown that the horse was possessed of any characteristic vice, or that defendant knew of any such vice."

The case of *Weigand v. Atlantic Refining Co., supra,* is directly in point. In that case the plaintiff was an experienced driver, but had been in charge of the team only four or five days. "In the afternoon, after having returned to the stables and cleaned the mules, he went into the stall for the purpose of leading one of them to the blacksmith shop. As he took hold of the halter, the mule threw its head around, struck the plaintiff and knocked him down, and then struck and kicked him." The Court said: "As it was not shown that the mule had ever before injured or attempted to injure any one, or that it had manifested in any way a vicious disposition, there was nothing in the testimony to warrant a recovery."

Upon the whole record, therefore, we are of the opinion that there was no sufficient evidence that the mule was "accustomed to do mischief," or that the owner had actual or constructive knowledge of any vicious or dangerous habit, or propensity, and that the motion for nonsuit should have been allowed. If recovery could be permitted under the facts in this case, then every farmer or contractor in the State could ill-afford to keep a mule.

Reversed.