CHARLES M. HERNDON, PENNSYLVANIA THRESHERMEN & FARM-
ERS' MUTUAL INSURANCE COMPANIES, AND NATIONWIDE IN-
SURANCE COMPANY v. ALEX ALLEN AND MARGARET DAVIS AL-
LEN, JANIE DAVIS GRIFFIN AND R. L. DAVIS, III, HEIRS OF F. M.
DAVIS, SR., T/A A PARTNERSHIP.

(Filed 2 November, 1960.)

1. Animals § 3—

It is the legal duty of a person having charge of an animal to ex-
ercise ordinary care and the foresight of a reasonably prudent person
in keeping the animal in restraint.

2. Same— Evidence held insufficient to show negligence in failing to
keep mule confined.

Evidence tending to show that defendants' mule became sick, that
the person in charge of the mule put a bridle on the mule and held the
mule for some four hours, that at about nine o'clock that night the
mule broke the throat-latch of the bridle and ran off, that the person
in charge of the mule thereafter vainly attempted to catch him, then
went to supper and did not try to get anyone to aid him in catching
the mule that night, and that early the following morning the mule
suddenly appeared on the highway in front of plaintiff's vehicle, re-
sulting in collision and damage, is held insufficient to be submitted to
the jury on the question of negligence in failing to exercise due care
to keep the animal in restraint.

APPEAL by plaintiffs from *Paul, J.,* March 1960 Term, of PITT.

Civil action brought by Charles M. Herndon against the original
defendant, Alex Allen, to recover for damages sustained as the re-
sult of a collision between a tractor-trailer owned and operated by
the plaintiff Charles M. Herndon and a mule alleged to have been
owned by Alex Allen.

Upon subsequent motions made in the cause, the court ordered
that the Pennsylvania Threshermen & Farmers' Mutual Insurance
Companies and Nationwide Insurance Company be made parties
plaintiff, and Margaret Davis Allen, Janie Davis Griffin, and R. L.
Davis, III, heirs of F. M. Davis, Sr., trading as a partnership, parties
defendant.

The collision occurred at approximately 3 A.M., on 24 January
1958 on U. S. Highway 258 about one mile south of the town limits
of Farmville, North Carolina. Plaintiff Herndon was driving north-
ward en route to Norfolk, Virginia, at a speed approximating 42 miles
per hour. The highway was paved and the pavement was dry. There
were shoulders on each side of the highway, and there was evidence
that cars were parked on the shoulders on both sides of the highway
near a house in which there had been a death, — unconnected with
incident here involved.

When plaintiff Herndon was near the parked cars a mule "popped out of nowhere." The tractor-trailer struck the mule, went across to the left side of the highway, and struck the corner of a barn which was approximately 60 or 70 feet away from the point of the mule impact. After striking the barn the tractor-trailer turned over on its right side off the highway.

Upon trial in Superior Court plaintiffs offered the testimony of Theodore Underhill in pertinent part substantially as follows: " * * * When I went on the farm I took care of that mule, and fed him. I worked that mule, kept him in a stable, or in the mule pen, the one down there, on the land of the Davis heirs. * * * On the 23rd day of January, as near as I can tell, on that particular date I was working on the plant beds and I had broke the bed and put the fertilizer out on it and had smoothed it off and took the mule out and tied him to the wagon. When my boy came from school, I told him to take him away and put him in the stable, and that was around 4:30, when I told him to put him in the stable. They came back to the bed around five o'clock and told me the mule was fighting the horse. I go up there to see about the mule and see that he was sick and fighting the horse. I first caught the horse and taken him out of the pen and then I hemmed the mule up in there and the best I could I put the bridle on him and put the horse back in the stable and I sent the little boy to tell Mr. Baldree to get the doctor. I took the mule out of the pen. I held him * * * I sent the boy up to Mr. Baldree's and he came down there. There was nothing we could do but hold him, and trotting him up and down the road, and he kept getting worse. Mr. Baldree. went after the doctor again. The doctor did not come. I held on to the mule and held on to the line. Later on in the night it got cold and he still got worser. I got on the inside of the barn whenever he come to fighting and cracked the door and held him. I had the mule outside the barn until the mule slung the bridle off. He ran and was swinging his head when the throat-latch broke. He threw off the bridle; then he ran out there under the tobacco barn shelter about ten o'clock * * * When this mule broke away, I had to go to the house from the tobacco barn. Really, I tried to catch the mule under the tobacco barn shelter and he run after me, so I left him alone. I went in the house and had supper. As to anything keeping me from going back out and finding that mule after supper, I had a dead grandbaby, that was the only thing. I went to see about her. I came two miles of Greenville here. That mule was in my care and keeping

the whole time I have been there on that place. Hard to say how old that mule was; I can't say actually. I worked him for seven years. * * * I tried to catch that mule, but not at that time of night did I try to get anyone else to catch that mule, no, sir."

Plaintiffs also offered testimony of Guy Baldree, who testified in pertinent part substantially as follows: " * * * On the 23rd day of January 1958, I sent one of the boys down there to see if he could get a doctor for the mule. I saw the mule. I went to Marlboro, and got another fellow to call the doctor. * * * Just a short while I went back to where Theodore was. The mule kept getting worse and Theodore asked me to go to get somebody else to see if he could get the doctor. I went."

And on cross-examination Mr. Baldree testified as follows: " * * * When I went down there, I saw the mule. Theodore was holding him to a line to keep him from getting hurt. The mule was out there in the lot, down in the lot a-rolling, and Theodore was holding on to that mule while that mule was rolling. The mule just kept a-rolling, and getting up and going again. That mule was getting up, getting down and rolling some more. This went on and I stayed there until between about 8:30 and 9 o'clock, and he was doing it all the time. I went down there just about dark and up as late as 8:30 or 9 o'clock, Theodore was still holding on to that mule. The mule was still getting up and going down and rolling. * * * The ground out there, which was normally fresh ground, looked like somebody had taken and dug it all to pieces. * * * The mule would get up, go three or four steps, roll over some more. I saw it when it got down on its hind legs and stood up. It would grunt whenever it looked like he was going to lay down, and it hurt him so bad he couldn't lay down. I cannot describe the way the mule looked, but I just noticed him. I have never seen a mule act like that before. * * * This all started just before dark or right at dark. When I left at 8:30 or 9 o'clock, Theodore still had hold of the briddle and still holding on to that mule. It was a cold night, almost below freezing. The mule was perspiring, just as wet as if it had been raining; just as wet as if water had been poured all over him."

No further attempt was made to capture the mule that night, but the search was resumed around 4 o'clock the following morning.

There was no evidence that the mule had ever escaped before the time in question, or that he had ever acted in such a strange manner.

At the conclusion of all the evidence, the attorneys representing the defendants moved for a judgment as of nonsuit. The motion

was allowed, and to judgment in accordance therewith the plaintiffs except and appeal to Supreme Court, and assign error.

*Robert M. Harcourt, James & Speight, W. H. Watson for plaintiff appellants.*
*Lewis & Rouse for defendant appellees.*

WINBORNE, C. J. In this State "the liability of the owner of animals for permitting them to escape upon public highways, in case they do damage to travelers or others lawfully thereon, rests upon the question whether the keeper is guilty of negligence in permitting them to escape. In such case the same rule in regard to what is and what is not negligence obtains as ordinarily in other situations. It is the legal duty of a person having charge of the animals to exercise ordinary care and the foresight of a prudent person in keeping them in restraint." *Gardner v. Black*, 217 N.C. 573, 9 S.E. 2d 10.

Indeed the measure of defendant's duty as owner of the mule to prevent it from roaming on the highway is repeated in *Shaw v. Joyce*, 249 N.C. 415, 106 S.E. 2d 459, as applied in *Gardner v. Black, supra*. See also *Lloyd v. Bowen*, 170 N.C. 216, 86 S.E. 797, and *Bethune v. Bridges*, 228 N.C. 623, 46 S.E. 2d 711.

Applying these principles of law to the evidence as shown in the record on this appeal, taken in the light most favorable to plaintiffs, giving to them the benefit of reasonable inferences arising thereon, this Court is constrained to hold that the evidence is insufficient to make out a case for the jury. Hence the judgment from which this appeal is taken is

Affirmed.