LONNIE A. GRINER v. DALLAS W. SMITH AND WIFE, WILMA SMITH, D/B/A SANDY HILL FARM

No. 7819SC978

(Filed 6 November 1979)

1. **Animals § 2.2— horse injured by another horse—vicious propensities—owner's negligence**

   Knowledge by the owner of the vicious propensities of his animal is not always essential to a recovery in an action for injuries alleged to have been caused by the owner's negligence; rather, the owner of a domestic animal is chargeable with knowledge of the general propensities of certain animals and he must exercise due care to prevent injury from reasonably anticipated conduct. Therefore, in an action to recover for the loss of plaintiff's horse which was destroyed after being seriously injured by another horse while both horses were in defendant's care, the trial court did not err in failing to require the jury to find that the horse which kicked plaintiff's horse had a vicious propensity and that defendants knew or should have known of this propensity.

2. **Evidence § 34.2— offer to compromise—evidence not prejudicial**

   In an action to recover for the loss of plaintiff's horse which was in defendant's care, the prejudicial effect of testimony concerning an offer to compromise was sufficiently dissipated by the trial court's prompt dismissal of the jury and subsequent instruction not to consider that testimony; furthermore, defendants cannot complain since their counsel failed properly to move to strike the incompetent testimony.

3. **Damages § 13— death of horse—expense of training another horse—evidence not prejudicial**

   In an action to recover for the loss of plaintiff's horse which was in defendant's care, evidence concerning the expense of training a horse to do those things which plaintiff's horse was able to do, though only remotely relevant to the value of the horse before its death, was not sufficiently prejudicial to require a new trial.

APPEAL by defendants from *Lupton, Judge.* Judgment entered 19 May 1978 in Superior Court, ROWAN County. Heard in the Court of Appeals 27 June 1979.

Plaintiff initiated this action to recover for the loss of his American Quarter Horse mare, Black Lake Bars. Black Lake Bars suffered an injured leg and had to be "put down" on 19 May 1977. Defendants are the proprietors of a horse breeding business in Davie County called Sandy Hill Farm. Black Lake Bars was injured while at Sandy Hill Farm for siring by defendants' American Quarter Horse stallion, Mr. Rocket Chick.

Plaintiff alleges that defendants impliedly agreed, as part of the arrangement for the breeding of Black Lake Bars, that they would use due care and skill in caring for Black Lake Bars while she was in their care and that they would redeliver the horse to plaintiff. They further agreed to return the $200 stud fee in the event the mare did not produce a live foal. He alleges defendants failed to redeliver the mare as contemplated by the agreement and failed to return the stud fee, resulting in his suffering damages in the amount of $10,200. In the alternative, plaintiff alleges that defendants impliedly promised to care for the mare in a careful and reasonable manner, but failed to do so in that they: placed the mare in a paddock with another mare whose nature and disposition were unknown to them; knew or should have known of the debilitating and destructive nature of the other mare; and after learning of the other mare's destructive nature, failed to separate the mares. Plaintiff alleges that as a proximate result of defendants' negligence, Black Lake Bars was kicked by the other mare and received a broken leg which required that Black Lake Bars be destroyed and which prevented her from producing a live foal, resulting in damages to defendant in the amount of $10,200.

Defendants answered averring that, consistent with the established practice in the trade, they are not responsible for accident, sickness, or death to the plaintiff's mare. Furthermore, they aver that plaintiff elected the pasture care program for his mare rather than the more expensive stall care program which would have segregated plaintiff's mare from the other mares. Defendants allege that at all times they used reasonable care while boarding plaintiff's mare. In the alternative, defendants allege that plaintiff was contributorily negligent in the following respects: he failed to request that Black Lake Bars be moved to stall care; he knew or should have known of the vicious and aggressive tendencies of Black Lake Bars yet negligently failed to so inform defendants; and prior to the incident resulting in the necessity of having Black Lake Bars "put down", services to the mare had been completed, but plaintiff refused to pick up the mare despite defendants' request that he do so. Defendants allege by way of counterclaim that plaintiff and defendant contracted orally for the transportation of plaintiff's mares. The reasonable value of those services, for which plaintiff allegedly is indebted to

defendants, is $183. Defendants also allege that plaintiff owes defendants a veterinary fee of $15 for a cervical culture of Black Lake Bars for which defendants paid.

Plaintiff testified at trial that Black Lake Bars was returned to Sandy Hill Farm in May of 1977 after an unsuccessful breeding with Mr. Rocket Chick during her foaling heat in early May of 1976. He stated that the stud fee was $200 per mare including transportation and that the boarding fee was $2 per day per mare. Another of plaintiff's mares, Black Friday, was also transported to Sandy Hill Farm for breeding in May of 1977. Neither mare had a foal at that time. On a Sunday in May of 1977, plaintiff visited defendants' farm and observed Black Lake Bars, Black Friday, and another outside mare, Dana's April, in a corral together. On that visit, plaintiff noticed an injury on the side of Black Lake Bars which he described as "bulging out the size of a football". He called to Mr. Smith's attention the fact that Dana's April had shoes. Smith responded, "Yes, that's dangerous." Smith also allegedly commented, "Well, they are having a time getting used to each other." He testified that Mr. Smith had told him that he couldn't keep Dana's April in a box stall because she would tear it up. He testified that defendants did not keep Black Lake Bars in a separate box stall as they had in May of 1976 when she had a foal by her side. He assumed she would receive the same accommodations when she was returned for breeding. The next Thursday, 19 May 1977, plaintiff was called by Mrs. Smith and told to come to the farm, that his horse had been involved in a terrible accident. Mrs. Smith already had contacted a veterinarian. When plaintiff arrived at the farm, Mrs. Smith told him that Dana's April had kicked Black Lake Bars and broken her leg. One of her back legs was broken just below the hollow. All three bones were broken, and the leg was dangling by the skin only. The veterinarian was of the opinion that the leg would never heal and suggested that Black Lake Bars be put to sleep, and this was done. Plaintiff expressed his opinion that immediately prior to the injury in 1977, Black Lake Bars was worth $8,000 to $10,000.

The plaintiff testified extensively concerning his experience with breeding and raising horses and explained the terminology involved in horse breeding. He testified that he purchased Black Lake Bars in 1975 at an auction sale for $400. At that time she

was in foal and suffering from the mange. She stood 14-2 hands and was a registered quarter horse. He testified that at other quarter horse farms the brood mares were commonly kept in separate stalls even when they did not have a colt by their side. He stated that Sandy Hill Farm offered the box stall plan and asserted that he had never heard of Sandy Hill Farm offering any other plan. He denied observing any incidents of fighting among the three mares which were pastured together.

Defendant Wilma Smith testified that her farm offers stall or pasture care for mares. A mare with a foal is automatically placed in a stall to protect the foal. The stall care is more expensive. Other mares are pastured together. She denied that Dana's April was an aggressive mare. Dana's April also was boarded at defendant's farm in April of 1976, and at that time showed no aggressive behavior. Mrs. Smith stated that she did not recall a knot on Black Lake Bars the Sunday of plaintiff's visit, and she did not overhear any conversation concerning an injury to plaintiff's horse.

Mrs. Smith described the events leading up to her discovery of Black Lake Bars' injury. The three mares were placed into a six-acre pasture. They peacefully were standing parallel to the fence close to where Wilma Smith was tending to some foals and mares — Black Lake Bars was in the middle, Black Friday behind, and Dana's April ahead of her six to eight feet away. Wilma Smith turned away and started into the barn when she heard a squeal. She went back through the barn and opened the door onto the horses' pasture when she observed the injured horse about 20 feet from where she was last seen standing. The veterinarian and the plaintiff were called immediately.

Dallas Smith denied observing any aggressive behavior among the horses. He also denied that plaintiff had mentioned there being any knots on Black Lake Bars the Sunday he visited. He also denies stating that Dana's April could not be kept in a box stall. With regard to the expense of transporting plaintiff's mares, Dallas Smith testified that plaintiff promised to pay for hauling the horses. When the first breeding was unsuccessful, plaintiff offered to pay, but defendants refused to take any money. After the May 1977 incident, plaintiff did not again offer to pay for the transportation, and defendants decided that since a

lawsuit had been filed they should seek compensation for the transportation.

The veterinarian who treated Black Lake Bars described the injury and explained that the arteries in the lower leg were so damaged that blood circulation had been destroyed, and surgery might be unsuccessful. He had the horse "put down" at plaintiff's direction. He further testified that it was not unusual to keep outside mares pastured together. Joan Backhaus, part owner of an established breeding farm, testified that the custom of the trade is to put brood mares in pastures together with other such mares. Lawrence Ross, a National Director of the American Quarter Horse Association, testified that brood mares are kept in pastures and that mares with foals are often also kept in pasture with other mares which have foals. John Shoaf, the owner of Dana's April, denied that she was an aggressive or vicious mare. He stated that she had often been around strange horses and to his knowledge never had kicked any of them. He denied that she could not be kept in a stall.

The case was sent to the jury upon instructions by the trial court on two issues: (1) "Was the plaintiff's horse, Black Lake Bars, injured by the negligence of the defendants?" (2) "What amount of damages, if any, is the plaintiff entitled to recover?" The jury answered the first issue in the affirmative and awarded plaintiff $3,225 in damages. Defendants appeal from the entry of judgment on the verdict, assigning error to rulings and instructions by the trial court.

*Burke, Donaldson & Holshouser, by Arthur J. Donaldson and William D. Kenerly, for plaintiff appellee.*

*Hudson, Petree, Stockton, Stockton & Robinson, by W. Thompson Comerford, Jr., and John F. Mitchell, for defendant appellants.*

MORRIS, Chief Judge.

[1] The primary question presented by defendants' appeal concerns the application of the North Carolina rule with respect to the liability of the keeper of domestic animals. Defendants contend that the trial court's instructions were erroneous because they failed to require the jury to find that Dana's April had a

vicious propensity and that defendants knew or should have known of this propensity. We reject defendants' contention for the reasons explained below.

The notion that a party must show the dangerous propensity of a domestic animal before establishing a basis for recovery arose originally in what were essentially strict liability cases. *See generally* Prosser, Law of Torts § 76 (4th Ed. 1971). The basis of the action was the neglect or failure of the owner to restrain the domestic animal known to be vicious and thus liable to do harm. *See generally* 3A C.J.S., Animals § 177; 4 Am. Jur. 2d, Animals § 86. *See also* Restatement, Second, Torts § 509, comment d. The early North Carolina decision of *Cockerham v. Nixon,* 33 N.C. 269 (1850), was expressed in language which smacks of such strict liability. The Court reasoned that the "fact [of a bull's viciousness and dangerousness] coming to the knowledge of the owner, is notice sufficient to put him in the wrong and make him liable for the consequences of his neglect to keep the animal confined." *Id.* at 270. The Court further stated:

> "When the owner knows or has reason to believe that an animal is dangerous, on account of a vicious propensity in him, from nature or habit (a term used to denote an acquired as distinguished from a natural vice), it becomes his duty to take care that no injury is done; and he is liable for any injury which is likely to be the result of this known vicious propensity." *Id.* at 271.

Although there may be argument to the contrary, we do not believe our Courts have ever authoritatively determined whether the strict liability rule as applied at common law now applies in North Carolina. The Court in *Hill v. Moseley,* 220 N.C. 485, 17 S.E. 2d 676 (1941), raised the issue but concluded that it was unnecessary to resolve the question in that action based upon negligence. Some other decisions applying the rule do not specify whether the action was brought in negligence. *See e.g., Sellers v. Morris,* 233 N.C. 560, 64 S.E. 2d 662 (1951); *Plumides v. Smith,* 222 N.C. 326, 22 S.E. 2d 713 (1942); *Harris v. Fisher,* 115 N.C. 318, 20 S.E. 461 (1894).

Recent decisions of the Supreme Court and this Court rendered in negligence actions suggest that the gravamen of the action is not negligence, yet nevertheless apply the standard of a

reasonable person. *See e.g., Sink v. Moore* and *Hall v. Moore,* 267 N.C. 344, 148 S.E. 2d 265 (1966); *Sanders v. Davis,* 25 N.C. App. 186, 212 S.E. 2d 554 (1975); *Miller v. Snipes,* 12 N.C. App. 342, 183 S.E. 2d 270 (1971), *cert. denied,* 279 N.C. 619, 184 S.E. 2d 883 (1971). All of these cases involved negligence actions. To the extent that those cases applied the reasonable person standard in the context of negligence actions seeking to recover for injury caused by the dangerous propensity of the animal, the decisions are no doubt correct. To the extent the language in those decisions might by implication affect other actions, it is dictum.

Our brief summary of the history of the North Carolina vicious propensity rule indicates that often times decisions are rendered without distinguishing between traditional negligence actions and actions which at common law might amount to actions involving strict liability. The reported decisions most often applying the vicious propensity rule arise in what is clearly a negligence context. *See e.g., Swain v. Tillett,* 269 N.C. 46, 152 S.E. 2d 297 (1967); *Sink v. Moore and Hall v. Moore, supra; Hill v. Moseley, supra; Hallyburton v. Fair Association,* 119 N.C. 526, 26 S.E. 114 (1896); *Pharo v. Pearson,* 28 N.C. App. 171, 220 S.E. 2d 359 (1975); *Sanders v. Davis, supra; Miller v. Snipes, supra; Patterson v. Reid,* 10 N.C. App. 22, 178 S.E. 2d 1 (1970). Into these decisions has been infused precedent from decisions such as *Cockerham v. Nixon, supra,* which presented facts which at common law would have supported a strict liability action upon proof of vicious propensity and knowledge by the owner. We consider this observation pertinent because it explains the origin of the rule as has been stated in negligence cases. What has evolved therefrom is not actually a hybrid cause of action but a line of cases enunciating a rule encompassing a specific application of the traditional standard of reasonable care in negligence actions. The rule correctly requires the keepers of domestic animals to guard against injury or damage from reasonably anticipated conduct of these animals. *See generally* Prosser, Law of Torts § 33 at 170 (4th ed. 1971). The line of cases beginning with *Rector v. Coal Co.,* 192 N.C. 804, 136 S.E. 113 (1926), state the rule as follows:

> "The liability of an owner for injuries committed by domestic animals, such as dogs, horses and mules, depends upon two essential facts:

1. The animal inflicting the injury must be dangerous, vicious, mischievous or ferocious, or one termed in the law as possessing a 'vicious propensity.'

2. The owner must have actual or constructive knowledge of the vicious propensity, character and habits of the animal." 192 N.C. at 807, 136 S.E. at 115.

This statement of the rule is accurate insofar as it is applied in cases wherein the damages are caused by the vicious propensity of the animal which is or should be known to the keeper. *Compare* Restatement, Second, Torts § 509(2); *see also* Prosser, Law of Torts § 79 at 517-18. These cases should not, however, be read as restricting the rights of action against the keeper of a domestic animal when injury is caused by conduct other than viciousness of an animal. For example, in *Lloyd v. Bowen*, 170 N.C. 216, 86 S.E. 797 (1915), the Court specifically rejected the contention raised by defendants that whenever an owner is sued for damage or injury caused by a domestic animal he must prove a vicious propensity and knowledge:

"[K]nowledge by the owner of the vicious propensities of his horse is not always essential to a recovery in an action for injuries alleged to have been caused by the owner's negligence. There may be negligence apart from this, but if the owner is not otherwise negligent and the injury is caused by the viciousness of the horse, then knowledge must be shown in order to charge the owner . . . ." 170 N.C. at 221, 86 S.E. at 799.

This is the accepted rule. The owner of a domestic animal is chargeable with knowledge of the general propensities of certain animals and he must exercise due care to prevent injury from reasonably anticipated conduct. *See generally* 4 Am. Jur. 2d, Animals § 89, 3A C.J.S., Animals § 178; Prosser, *id.* Therefore, not all actions seeking recovery for damage caused by a domestic animal need involve the vicious propensity rule.

The language of the Court in *Lloyd v. Bowen, supra,* is uniquely appropriate here. In response to a challenge to the sufficiency of instructions in a case where plaintiff was injured by defendant's horse, the Court concluded:

"The court correctly defined negligence and proximate cause, and also properly applied the rule of the prudent man to the facts as the jury might find them to be. The question of negligence in regard to the horse did not depend, in this case, solely upon defendant's previous knowledge of his vicious or unruly habits. It would be a circumstance to be weighed with others disclosed by the evidence." 170 N.C. at 220, 86 S.E. at 798.

Defendants next assign error to the trial court's denial of their motions for directed verdict on the specific grounds that "there was insufficient evidence of vicious propensity or of defendants' knowledge of any vicious propensity of Dana's April for the case to be submitted to the jury." In light of our previous discussion, it is clear that defendants' negligence does not depend solely upon their knowledge of Dana's April's vicious propensity. There was sufficient evidence of other bases of negligence to go to the jury.

[2]  Defendants' third assignment of error asserts prejudicial error in the admission of testimony concerning an offer of compromise. The testimony arose during direct examination of the plaintiff:

"Q. At the time when Mr. Smith brought Black Friday back to your acreage, did you have any conversation with him about Black Lake Bars?

A. Yes, I did.

Q. Do you recall who started that conversation? Who initiated it?

A. He did.

Q. How did that conversation start?

A. Well, he said he would like to make restitution.

MR. VAN HOY: OBJECTION.

COURT: OVERRULED.

EXCEPTION NO. 2

Q. What did he say?

A. He said that he would like to make restitution.

MR. VAN HOY: Your Honor, I would like to be heard on that, please.

COURT: All right, Members of the jury, go to the jury room."

A *voir dire* was conducted after which the trial court instructed the jury as follows:

"COURT: Members of the jury, the court instructs you not to consider that part of Mr. Griner's testimony in which he stated that Mr. Smith said that he would like to make restitution."

In our opinion, the prejudicial effect of the testimony concerning the offer of compromise was sufficiently dissipated by the trial court's prompt dismissal of the jury and subsequent instruction not to consider that testimony. Furthermore, it is clear from the record that the defendants' counsel failed properly to move to strike the incompetent testimony. *See generally* 1 Stansbury, N.C. Evidence § 27 (Brandis rev. 1973).

[3] Finally, defendants argue that certain testimony elicited on redirect examination of plaintiff concerning the training of a new horse so that it could work like Black Lake Bars did before her death was incompetent. Defendants' counsel interposed a timely objection and motion to strike the testimony. The appropriate measure of damages for the loss of livestock is the value of the animal alive just prior to its loss, minus the value, if any, of the carcass when there is evidence of the value of the carcass. *See e.g., Godwin v. R.R.,* 104 N.C. 146, 10 S.E. 136 (1889); *Boing v. R.R.,* 91 N.C. 199 (1884); *Roberts v. R.R.,* 88 N.C. 560 (1883); *see also Rippey v. Miller,* 46 N.C. 479 (1854) (horse killed by defendant). *See generally Annot.,* 79 A.L.R. 2d 677 (1961). Evidence concerning the expense of training a horse to do those things which Black Lake Bars was able to do is only remotely relevant to the value of the horse before its death, in light of plaintiff's specific testimony as to the fair market value of the horse. Although the remoteness of the probative value of evidence is often grounds for its exclusion, in our opinion the testimony was not of sufficient prejudicial character to render its admission prejudicial error requiring a new trial.

For the reasons stated, we find in the trial court proceedings.

No error.

Judges PARKER and MARTIN (Harry C.) concur.