[Civil No. 2560.   Filed May 24, 1927.]

[256 Pac. 503.]

# PAOLO PERAZZO, Appellant v. JOSE ORTEGA, Appellee.

Messrs. Alexander & Christy and Mr. Robt. Mc-
Murchie, for Appellant.

Mr. D. A. Fraser and Mr. Albert R. Smith, for Appellee.

McALISTER, J.—This case is before the court a second time, the first appeal having resulted in an order directing a new trial. See 29 Ariz. 334, 241 Pac. 518. In the second trial and upon practically the same pleadings and evidence the plaintiff recovered judgment for the same amount as in the first, and from this and the order denying his motion for a new trial the defendant appeals.

The substance of the complaint is that on April 28th, 1924, while plaintiff was riding west on the Tempe Road, a public highway in Maricopa county, Arizona, upon his bicycle, a vicious black dog, which the defendant owned and kept and knew to be ferocious and accustomed to worry domestic animals and attack and bite mankind, ran from under the fence of the yard of defendant, which was contiguous to said Tempe Road, and attacked and bit the plaintiff and threw him from his bicycle with such force and violence as to fracture his left elbow; that as a result of this attack he suffered great pain, had his left arm permanently disabled, was compelled to employ a physician and incur hospital bills, and has been prevented from working, all to his damage in the sum of $8,000. The answer was a general demurrer and a general denial, and the jury returned a verdict in favor of the plaintiff for $5,000.

Three errors are assigned, but they raise only these two legal propositions, namely: First, the evidence is insufficient to establish *scienter* on the part of the defendant, that is, knowledge of the dog's ferocious disposition; second, the damages awarded are excessive and the verdict of the jury the result of passion and prejudice.

Before the plaintiff can recover it must appear, in addition to the fact that he was injured as alleged,

that the dog was vicious and that the defendant not only owned or kept it but had knowledge of its vicious propensities. Two of these propositions, namely, that the plaintiff was injured substantially as alleged and that the dog was ferocious and vicious, are not contested though not admitted, but the allegation that defendant knew of such viciousness is, the contention being that the testimony does not sustain it. Appellee contends, however, that the evidence establishes such knowledge, not merely constructively but even expressly, and in support of this contention directs our attention to a number of excerpts therefrom. This, however, is contradicted in part, but the fact that there is a conflict regarding it is immaterial since the inquiry is whether the testimony is sufficient to support the finding implied in the jury's verdict that the defendant knew the dog's vicious propensities and not whether it preponderates on one side or the other of this proposition. The court instructed the jury that it was incumbent upon the plaintiff to prove that the defendant had such knowledge before he could recover; hence, if there is sufficient evidence to support its conclusion, regardless of that to the contrary, its decision is binding on us, since the weight of the testimony is a matter wholly within its province.

Concepcion Gastelo, who at the time was living just east of the defendant in one of his houses, testified as follows:

"I had a conversation with her (Mrs. Perazzo) in the kitchen. Mr. Perazzo was present. She told me that the black dog had bitten a Mexican. Then Mr. Perazzo came out and said that these dogs were going to cost him lots of money and that if he loses the case he was going to take it over to Italy. Every time I would go down there the black dog would bark, and I told Mrs. Perazzo to tie up the dog, that it would bite some person. Prior to the latter part of April, 1924, I never did see this black dog chase

any person. Prior to the time of the attack upon Mr. Ortega in the latter part of April, 1924, Mrs. Perazzo in the presence of Mr. Perazzo told me about another attack made upon a person by this black dog. . . . I don't remember whether Mr. Perazzo was there when Mrs. Perazzo told me that that same dog had bitten or tried to bite a woman.''

Georgiana Stubbs, who lived in the neighborhood, was crossing the bridge on the Tempe Road just west of the defendant's house in February, 1924, when three dogs ran out of defendant's yard through a hole in the corner of the fence. She testified:

''One was a black dog, one was white and the other kind of reddish looking. The black dog was at the front and the other two behind. They made a break at me as though they were going to bite me, and I screamed, and the folks at the store run out and hollered at the dogs, and I run back on the bridge, and the dogs turned around and went back in the hole in the yard. . . . I know they tied them up after that. Coming from my home I had to cross the bridge to go to Lambert's. When I screamed . . . they stopped; I broke and run. I was off the bridge when the dog made a break at me. I run and clumb up on the bannister. After getting the clothes I went back across the bridge; the dog didn't come back.''

Mrs. Rosario de Lambert, who lived across the road almost in front of Perazzo's, testified:

''The Perazzos have three dogs, one is black, the other white, and the other brown. . . . I saw when she was screaming there by the bridge. She got on top of the bridge there, the railing. I don't know whether they bit her or not. I know Mrs. Perazzo come out there. The dog went back in the yard after that and went inside the house. . . . This black dog I know it is there, and I know it belongs to them. They take care of it. He is tied up most of the time, and when they turn him loose he gets vicious. . . . What I mean by saying that the dog is vicious

is when they turn him loose or he gets loose he barks at dogs and everybody else."

In the light of the foregoing the jury was clearly justified in finding that Perazzo had knowledge of the dog's vicious disposition. The testimony of Concepcion Gastelo and Rosario de Lambert, if true, and this was for the jury to determine, shows conclusively that Mrs. Perazzo had such knowledge, and, as stated in the former opinion, the law is that the knowledge of the wife is imputed to the husband. The language used therein is that:

"The knowledge need not be actual, but may be imputed, and notice to the wife while she is, with the knowledge of the husband, in actual custody or control of the dog is notice to the husband."

Appellant contends, however, that even though the court adheres to the doctrine of imputed notice as announced at that time, the trial court erroneously instructed the jury in this action by stating to it "that the owner or keeper of a dog may be charged with notice of its vicious propensities by reason of his wife's knowledge thereof." The objection to this statement is that it fails to include within its purview the idea contained in the foregoing language that before the notice received by the wife can be imputed to the husband, it should be received by her "while she is, with the knowledge of the husband, in the actual custody or control of the dog," but instead tells the jury in effect that notice to the wife under any circumstances is chargeable to the husband. This instruction was given in the first trial identically as it appears here and specifically approved in the former opinion; hence, it is clear that the court was of the view that the fact that it did not contain the limiting clause is immaterial, otherwise it would not have held it correct, and we are still of that opinion.

The authorities cited by the court on the proposition, with the exception of *Smith* v. *Royer et al.*, 181 Cal. 165, 183 Pac. 660, state the rule in much the same language, certainly the same in meaning, as the instruction in this case. For instance, in *Ayers* v. *Macoughtry,* 29 Okl. 399, 37 L. R. A. (N. S.) 865, 117 Pac. 1088, the court said:

'In our judgment, the instruction was not erroneous. It has been held in numerous cases, that where knowledge was had of dangerous and vicious propensities of a dog by others of the owner's household, he was held to have the knowledge which they possessed.''

Following this statement the court cites in that case *Barclay* v. *Hartman,* 2 Marv. (Del.) 351, 43 Atl. 174, and *Boler* v. *Sorgenfrei et ux.* (Sup.), 86 N. Y. Supp. 180, upon the proposition that the wife's knowledge is sufficient, and in none of them is anything said about the necessity of her being to the knowledge of the husband in actual custody or control of the dog. In *Halm* v. *Madison et ux.*, 65 Wash. 588, 118 Pac. 755, the wife, one of the parties defendant, had been warned of the dog's biting another child, and the court said this was sufficient to put her upon inquiry as well as to constitute notice to her husband, the theory being that notice to one joint owner of a vicious animal is notice to all of such owners. In *Mailhot et ux.* v. *Crowe et ux.*, 99 Wash. 623, 170 Pac. 131, a case not cited in the former opinion, the court states that "notice to servants or members of the family constitutes notice to the owner or keeper.''

It might be well to say also that in addition to the knowledge of Mrs. Perazzo, the testimony of Floyd Gallogly discloses that Francis Donofrio, the grandson, twelve years of age, who had lived with the Perazzos since he was four or five, had been notified of the dog's vicious propensities. He testified:

"They have three dogs at Perazzo's. . . . My experience commenced in April, 1923, shortly after I moved there. . . . The dogs would run at me when I would have business on the north side of the canal. With reference to this black dog, my experiences have been varied. . . . I don't think he was ever alone. The dogs would generally meet me at the corner. They would run a bluff; then I would run a bluff. The dogs would try to scare me, then I would try to scare the dogs. Rocks and a club were the means I took to scare the dogs. I didn't take any foolish chances with them. . . . There were times he was growling and other times he was quiet. I did not at any time notify the Perazzos about the actions of their dog. I told little Francis Donofrio."

If the law did not impute to the defendant his wife's knowledge thereof, it occurs to us that the evidence discloses the dog's vicious propensities in a degree so pronounced that it might reasonably be implied that he had such knowledge. In addition to what has already been stated, the witness Sanabia Miranda testified that a number of times prior to April 28th, 1924, this black dog came out as he went by and wanted to bite him; that he threw rocks at the dog and on one occasion went down the canal two hundred yards, crossed on a cable, because the dog met him at the bridge and he had nothing with which to defend himself. The testimony of A. Lambert, who lived across the road from Perazzos, was that the dog had been there for ten years and ran at him one day about a quarter of a mile north of the Perazzo home where he was milking; that he threw a bucket of milk at him and after that carried a .45 automatic with which to protect himself, it being necessary for him to shoot on one occasion as the dog came close to him. Jesus Urbina, another witness, who passed Perazzo's place a number of times in March, 1924, on his bicycle, testified that on the 15th of that month the dog knocked him down

about one hundred yards east of Perazzo's house and that on the 12th of the same month it and another dog came out about 8 o'clock at night, knocked him from his bicycle and bit him in the leg, the scar from the bite being there still.

The defendant was the owner and manager of the place and in and about the house practically all the time. He had kept and harbored the dog or permitted it to be done for ten years, the grandson, Charles Donofrio, eighteen years of age and a member of the family since he was ten or twelve, being the owner, and a number of its vicious acts for a period of a year or more previous to this were shown. If the testimony pertaining to these be true, it passes belief that such frequent exhibitions of vicious tendencies towards people going along the public highway in front of the home did not apprise the defendant of his ferocious disposition and of the fact that it was dangerous for him to be permitted to run loose. It is unbelievable that so many acts of this nature could have happened and the defendant be without some knowledge of them. As said by the court in *Martin* v. *Borden,* 123 App. Div. 66, 107 N. Y. Supp. 725:

"The evidence showed that the dog had habitually run out of the yard where the defendant lived with his parents and angrily attacked people in the street, afoot, on bicycles and in wagons for several months, though without getting hold of them. This was ample to imply knowledge to the defendant. It is permissible to find that he knew what was so notorious."

And in R. C. L., volume 1, page 1118, this language appears:

"Where one keeps on his premises a dog which has attacked or bitten a considerable number of persons, and is notoriously cross and vicious, it may be presumed that the owner has some knowledge of this fact."

"In accepting plaintiff's evidence," said the court in *Merritt* v. *Matchett,* 135 Mo. App. 176, 115 S. W. 1066, "the jury were entitled to infer that defendant, who had harbored the dog a long time, knew of its vicious or mischievous habits and propensities. 'Proof that the animal is of a savage or ferocious nature is equivalent to proof of express notice.'"

The other proposition raised is that the verdict of $5,000 is so excessive that it is evident that it was rendered as a result of passion and prejudice on the part of the jury. The testimony discloses that Ortega a young man twenty-seven years of age, was attacked by the dog and thrown from his bicycle upon the paved highway, that his arm was broken near the elbow in two places, and that he was bitten by the dog in the right thigh and spent eleven days in the hospital. His physician, Dr. George E. Goodrich, testified as follows concerning his injury:

"I found that he had a fracture of the olecranon process, a fracture of the inner condyle of the humerus and a fracture of the head of the radius. The elbow joint was all torn to pieces. . . . I have continued treating the patient since that time; for many months saw him almost daily, and off and on during the past eighteen months. . . . The recent treatment has been simply to relieve pain. He has an involvement of the ulna nerve and scar tissue at the elbow joint which causes a good deal of pain. That is all I have been doing for him for the past eighteen months. *The injury is permanent.* By having another operation he can have that nerve loosened and probably be relieved of that pain. That operation would not restore the function of the elbow. He has a very limited function in that arm, and I think *will never be able to do hard work with it. He would not now be able to work as a laborer digging graves.*"

At the time of the injury in April, 1924, Ortega was making $2.45 a day as a grave digger, but

twenty-three months afterwards, when the second trial took place, he had been able to work only about one month and then as a watchman for which he received one dollar a day and board. During all this time he was under the care of a physician, who testified that the reasonable value of his services was $1,000 but that he had rendered a bill for $800. Two juries under substantially the same facts, except that the testimony in the second trial as to the dog's vicious propensities is stronger than in the first, have fixed the plaintiff's damages at $5,000, and we are unable to see wherein this sum can be deemed excessive.

The judgment is affirmed.

ROSS, C. J., and LOCKWOOD, J., concur.