ROSALIND HAYMAN SWAIN v. ELIZABETH H. TILLETT, Administra-
TRIX OF THE ESTATE OF HERMAN A. TILLETT; ELIZABETH H. TILLETT,
INDIVIDUALLY, AND RADFORD TILLETT.

(Filed 20 January, 1967.)

**1. Animals § 2—**

Deer are subject to domestication to such degree that the owner or
keeper of a tame deer is liable in damages for personal injury inflicted
by the animal to the same extent as the owner or keeper of a domestic
animal.

**2. Same—**

The owner or keeper of a domestic or domesticated animal may be held
liable for injury inflicted by such animal if it is proven that the animal
was dangerous, vicious, mischievous, or ferocious, and that the owner or
keeper knew or should have known of the animal's vicious propensity.

**3. Same—**

The keeper of an animal is one who undertakes to manage, control, or
care for the animal in the manner of an owner. If he has knowledge
of the animal's vicious propensity, he is liable for injuries inflicted by
it even though he is not its owner.

**4. Same—**

After the death of intestate, the owner of a domestic deer, his widow
continued to keep the animal. *Held:* The widow, in her individual ca-
pacity, is liable for injuries inflicted by the animal upon a proper show-
ing, since, if the administration had not been complete at the time of the
injury, she was still the keeper of the animal.

**5. Same—**

After the death of his father, the son went every day to the home and
frequently aided his mother in tending and looking after a deer which
his father had owned, and exercised control over the animal. *Held:* The
son was a joint keeper of the animal within the rule of liability for dam-
ages inflicted by the animal.

**6. Same—**

The evidence tended to show that the widow and her son were joint
keepers of a tame deer at the widow's home. *Held:* Notice to the son of
the vicious propensity of the deer is notice to the widow.

**7. Same—**

The evidence tended to show that the widow and her son kept a tame
deer on the widow's premises, that the deer attacked plaintiff on plaintiff's
own premises and plaintiff gave notice to the son of the attack, and that
about a week later the deer again attacked plaintiff on her own premises,
inflicting the injury in suit. *Held:* Nonsuit was correctly denied in plain-
tiff's action against the son and the widow in her individual capacity.

**8. Same; Executors and Administrators § 22—**

The evidence tended to show that after the death of the owner of a
tame deer, the widow of the owner continued to keep the deer on the
premises, that the widow was charged with knowledge of the vicious

propensity of the deer, and that the deer thereafter inflicted personal injury upon plaintiff. *Held:* The widow in her representative capacity is not liable for the injury, since ordinarily the estate of a decedent cannot be held liable for torts committed by the administrator.

**9. Animals § 2;    Evidence § 15—**

In this action to recover for personal injury inflicted by a deer, plaintiff testified to the effect that she knew that the animal which attacked her was the one kept by defendants because she knew the deer and because a wild deer would not attack a person. Defendants contended that the deer kept by them was never out of his pound. *Held:* Testimony of a witness that on an occasion when she attempted to run a wild buck and several does out of her yard, the buck had attacked her, was competent upon the question, and the exclusion of the testimony was prejudicial error.

**10. Animals § 2;    Evidence § 35—**

While a State wildlife protector may testify from his observation of deer for a period of five years as to whether a wild buck is likely to attack a human being during the fall season, the court may properly exclude his testimony when the question intended to elicit such testimony is ambiguous in asking whether only a tame deer would, under given circumstances (which were not explained) attack or attempt to attack a human being.

**11. Animals § 2;    Evidence § 51—**

Where a wildlife protector of some five years' experience has not been offered as an expert, the exclusion of his opinion testimony requiring expertise in the physiology of deer will not be disturbed, since it will be presumed that the court excluded the testimony on the ground that the witness had not been sufficiently qualified.

Pless, J., dissenting.

Appeal by defendants from *Hubbard, J.,* January 1966 Session of Dare.

Plaintiff instituted this action to recover damages for personal injuries inflicted upon her by an animal. She alleges that the animal was a buck deer kept by defendants, who negligently permitted it to roam at large after notice of its vicious propensities. Both plaintiff and defendants offered evidence. Taken in the light most favorable to plaintiff, the evidence tends to show:

Defendant Elizabeth H. Tillett is the widow and administratrix of Herman A. Tillett, who died intestate on January 10, 1962. Defendant Radford Tillett is their only child. At the time of his death, Herman A. Tillett owned a five- or six-year-old buck deer, which he acquired when it was less than a year old. The Tillett property adjoined the lot on which plaintiff lived with her daughter. Plaintiff had seen the deer "off and on" every day for about five years, and had watched him grow up.

During his lifetime, Mr. Tillett had kept the deer in a pound surrounded by a 9-foot fence. The deer pound was inside a larger pas-

ture in which ponies were kept. After Mr. Tillett's death, defendants turned the deer into the pasture with the ponies. The pasture was surrounded by a "ragged fence" 4½ feet high; it was "not much of a fence, mostly wood and old wire." The deer walked in and out, "right through it." Nearly every day he would follow the same well-worn path from the fence, over a ditch and through the vines and myrtles, into plaintiff's yard. While Mr. Tillett lived, plaintiff had never seen the deer out of the pound. After his death, his widow continued to live on the property and to keep the deer. She and her son Radford, who lived with his wife and two children less than half a mile away, fed and looked after the deer. It was a tame deer, and prior to the week preceding November 7, 1962, it had never molested plaintiff. On Monday of that week, however, he chased her when she went out to feed her livestock. She retreated inside the gate, and the deer walked back and forth knocking his horns against the fence. Later, thinking he had gone, plaintiff started for the house. The deer came out of the shrubs and chased her into the house. From inside, she watched him go down the path and into his pasture. The next day when she went out to feed, the deer came from behind the fig bushes and chased her back into the house. Again she watched him return to his own pound.

After the second attack, plaintiff called one Billy Gray and asked him to tell Mrs. Tillett to take the deer up because he had chased her twice and she was afraid of him. Notwithstanding, on Thursday of the same week, the deer was back in her yard when plaintiff came out of the house. He chased her again and hit her on the hip before she could get the door open. Once more she watched the deer leave by the same path to enter his pound. She called Billy Gray again and told him to tell Mrs. Tillett that the deer was out; that it had butted her; and that if she did not keep it up, plaintiff would "report her to the State or County." Instead of communicating with Mrs. Tillett, Billy Gray saw Radford Tillett at his home and told him that the deer was out and had butted plaintiff. Gray offered to help him get the deer in, but Radford said he did not need any help.

About 4:45 on the afternoon of November 7, 1962, plaintiff went out to the garage (one side of which was used for storage) to get some plants. While thus engaged, she saw the deer coming directly toward the garage on the path underneath the grapevines. As she attempted to climb a ladder into the loft to escape the deer, he entered the garage, jumped straight up and down, hit her in the stomach, and knocked her down. At the same time, he overturned a big oil stove onto her. She pulled herself up by a post and stood still. The deer also stood still for a little while. Then, while his mouth frothed, he began the stiff-leg jumping which was one of his charac-

teristics. Plaintiff made another attempt to get to the ladder. When she did, the deer hit her in the stomach again. She grabbed his horns; "they were slick, and the knobs were not big enough to hold him." She fell over the lawn mower and into a box in a wheelbarrow, and the deer backed out of the garage. Once more she attempted to reach the ladder, but the deer returned to charge her again. This time he broke her leg, her kneecap, and her wrist, and inflicted multiple contusions and abrasions upon her. Hearing plaintiff's screams, one Frank Richlie (a kinsman of both plaintiff and defendants) came into the garage. He threw a jug at the deer and chased him away with a stick. Plaintiff saw the deer disappear under the grapevine down the path over which he had come. As a result of the attack, plaintiff sustained serious and permanent injuries.

The night after plaintiff was injured, defendants and Mrs. Radford Tillett called on plaintiff's daughter. When she inquired of them how the deer got out of the pound, Mrs. Radford Tillett said, "We turned him out." Defendants made no denial. Radford said, "I will have the game warden come and get him in the morning."

The evidence for both plaintiff and defendants tended to show that there were wild deer in the vicinity. Plaintiff, however, testified positively that it was not a wild deer which attacked her:

"It was Lizzie's and Herman's and Radford's deer. I know it. I watched it grow up. He had a way he would straighten his legs stiff, and he would jump up and down like that (demonstrating with hands), and a wild deer won't run you besides, and won't do that. A wild deer won't run you and won't straighten his legs stiff and jump up and down. A wild deer won't go in a house. A wild deer will run the minute he smells you. It was a tame deer."

Defendants' evidence tended to show: The Tillett fences were in good repair. Their deer had antlers five or six inches long on both sides of his head, and they were large enough to grasp. (There was no evidence as to the length of the prongs or "knobs.") He was about three feet high and weighed approximately 80 pounds.

Mrs. Tillett testified that she and her grandchildren — 2½ and 8 years old — were frequently in the pasture with the deer and ponies; that they sometimes fed "the pet deer" together; and that they had never experienced any trouble. Radford Tillett testified that he saw the deer "on an average most every day throughout the years." He said:

"After Mrs. Swain was hurt, I called Mr. Forbes (State Wildlife Protector for Dare County) and told him I had been

notified that it was my deer in the accident, and he told me to shut him up and that he would be over later on. . . . I went down to my mother's, and the deer was in the pasture and I led him over and put him in the higher pen. His appearance and actions were no different from other times; he was calm, gentle and showed no signs of being frightened or hurt. There were no signs of any injury on him, he was perfect, no scratches, no bruises or anything.

". . . (A)bout a week before the accident he (Billy Gray) came to my house and told me that Mrs. Swain had notified him that my deer was over to her house and that the dogs were chasing him around, and for me to come down and get him. Billy offered to help and I told him I could handle it. I told Billy I would go right down, which I did, and went out in the pasture and there was my deer. So I turned around and went on back home and never thought any more about it.

\* \* \*

". . . By reason of my interest in that deer, I felt a little responsibility for the deer. I went to my mother's house every day after my father died. I saw the deer there every day. I fed the deer occasionally, and my mother fed him. In the feeding and caring for the deer, you might say that my mother and I sort of jointly looked after him."

On the night of December 14, 1962, some unknown person killed the deer, which had been put inside the inner pound.

Defendants offered the testimony of Mrs. Tom Beacham, who, had she been permitted to do so, would have testified that on one occasion in Kitty Hawk, when she had attempted to chase three or four wild does and a big buck from her yard, the does ran but the buck deer shook his head, pawed at the ground, and chased her into her house. Upon plaintiff's objection, this evidence was excluded.

Each defendant's motions for judgment of nonsuit were overruled. The jury, in answer to issues, to which there were no objections, found both defendants guilty of negligence and awarded plaintiff damages. From judgment entered upon the verdict, defendants appeal.

*Aydlett & White and Frank B. Aycock, Jr., for plaintiff.*
*Russell E. Twiford and John H. Hall for defendants.*

SHARP, J. Defendants assign as error the failure of the court to sustain their respective motions for nonsuit. Radford Tillett contends that he has no responsibility for the deer's actions because he

was not its owner. Mrs. Tillett contends that she has no liability since there is no evidence tending to show that she had any knowledge that the deer had developed any dangerous propensities. These contentions must be assayed against the following applicable principles of law:

"Certain animals *feræ naturæ* may be domesticated to such an extent as to be classed, in respect of the liability of the owner for injuries they commit, with tame or domestic animals. . . . Thus, deer are subject to such substantial domestication as to come within this principle." 4 Am. Jur. 2d, Animals § 83 (1962); 2 Kent, Commentaries 349 (1884). (The case was tried upon the theory that the Tillett deer was a tame deer, a domesticated animal.) To recover for injuries inflicted by a domestic animal, *domitæ naturæ*, plaintiff must allege and prove: "(1) that the animal was dangerous, vicious, mischievous, or ferocious, or one termed in law as possessing a vicious propensity; and (2) that the *owner* or *keeper* knew or should have known of the animal's vicious propensity, character, and habits." (Emphasis added.) *Sellers v. Morris,* 233 N.C. 560, 561, 64 S.E. 2d 662, 663; *Plumidies v. Smith,* 222 N.C. 326, 22 S.E. 2d 713; *Hill v. Moseley,* 220 N.C. 485, 17 S.E. 2d 676. See also *Sink v. Moore and Hall v. Moore,* 267 N.C. 344, 148 S.E. 2d 265. "The gravamen of the cause of action in this event is not negligence, but rather the wrongful keeping of the animal with knowledge of its viciousness; and thus both viciousness and scienter are indispensible elements to be averred and proved." *Barber v. Hochstrasser,* 136 N.J.L. 76, 79, 54 A. 2d 458, 460; 2 Strong, N. C. Index, Animals § 2 (1959).

The owner of an animal is the person to whom it belongs. The keeper is one who, either with or without the owner's permission, undertakes to manage, control, or care for the animal as owners in general are accustomed to do. 4 Am. Jur. 2d, Animals § 92 (1962); 3 C.J.S., Animals § 165(b) (1936). It is apparent that a keeper may or may not be its owner. *Janssen v. Voss,* 189 Wis. 222, 207 N.W. 279. "The word 'keep,' as applied to animals, has a peculiar signification. It means 'to tend; to feed; to pasture; to board; to maintain; to supply with necessaries of life.' " *Allen v. Ham,* 63 Me. 532, 536. *To keep* implies "the exercise of a substantial number of the incidents of ownership by one who, though not the owner, assumes to act in his stead." *Raymond v. Bujold,* 89 N.H. 380, 382, 199 Atl. 91, 92. *Accord, Lanna v. Konen,* 119 Conn. 646, 178 Atl. 425.

At the time plaintiff was injured, Herman Tillett had been dead ten months, lacking three days. Although the record is silent as to the status of his estate, we assume that its administration had not then been completed. Pending the administration, title to the deer

was in his administratrix, Mrs. Tillett. *Spivey v. Godfrey,* 258 N.C. 676, 129 S.E. 2d 253. Plaintiff sued her both in her representative and individual capacity. Had the administration been completed, nothing else appearing, defendants would have owned the deer jointly. G.S. 29-14(1). However, liability for injuries inflicted by animals, *feræ naturæ* or *domitæ naturæ,* does not depend upon the ownership of the animal. " 'The essence of the action is not ownership, but the keeping and harboring of an animal, knowing it to be vicious.' . . . Thus the responsibility to respond in damages depends not upon who has legal title to the (animal) but rather upon the possessor of the animal." *Hunt v. Hazen,* 197 Ore. 637, 639, 254 P. 2d 210, 211. The *keeper* of an animal with known vicious propensities, nothing else appearing, is liable for injuries inflicted by it upon another. 3 C.J.S., Animals § 165 (1936).

The testimony of Radford Tillett (quoted in the statement of facts) is sufficient to establish that he and his mother were joint keepers of the deer. As the only child of a deceased father, he dutifully went every day to the old home to do for his widowed mother those things which needed to be done. *Inter alia,* he kept a watchful eye on the deer and the ponies. Sometimes he fed the deer; sometimes his children and Mrs. Tillett fed it. It was "a family appendage," cherished all the more because it had belonged to the deceased husband and father. Indubitably, it gave his grandchildren much pleasure and was of great interest to them. Radford spoke of it either as "our deer" or "my deer." He said, "We permitted the deer to live in the pasture as a whole after my father's death. . . ." When Billy Gray gave Radford plaintiff's message about a week before she was injured, he went immediately to investigate without mentioning the matter to his mother. He testified that when he found the deer where it was supposed to be, he "turned around and went on back home and never thought any more about it." After plaintiff was hurt, it was Radford who reported the matter to the Wildlife Protector. He said, "I called Mr. Forbes and told him that I had been notified that it was my deer" in the accident. It was Radford who put the deer in the inner stockade upon Mr. Forbes' instructions. In short, Radford assumed responsibility for the deer. He was, in both the ordinary and legal sense of the words, one of its two joint keepers. He and his mother exercised joint control over it. See *Lanna v. Konen, supra.*

Plaintiff's evidence was sufficient to establish that, a week before the accident, Radford had been notified that the deer had attacked her. "The rule is that as soon as the owner knows or has good reason to believe that the animal is likely to do mischief, he must take care

of him; it makes no difference whether this ground of suspicion arises from one act or from repeated acts." *Cockerham v. Nixon,* 33 N.C. 269, 270. This rule is equally applicable to a keeper. The motion for nonsuit as to Radford, therefore, was properly overruled.

As to Mrs. Tillett, there is no evidence that she herself ever received any notice that the family's "tame deer" had developed vicious propensities. The ruling upon her individual motion for nonsuit depends upon whether notice to Radford was notice to her. The general rule is that notice of an animal's vicious propensities "to one joint keeper is notice to all such keepers." 4 Am. Jur. 2d, Animals § 91 (1962). *Accord,* 3 C.J.S., Animals § 148(d)(2) (1936). In *Barber v. Hochstrasser, supra,* the defendants, husband and wife, jointly kept a dog which, to the *wife's* knowledge, had vicious propensities. The court held both liable, saying: "The custody of a vicious animal . . . is the custody of all joint keepers; and they are all jointly liable for the damage done by it. And, by the same reasoning, notice to one joint keeper is notice to all such." *Id.* at 461. In *Hayes et al v. Smith,* 15 Ohio Cir. Ct. 300, in holding the defendants liable to the plaintiff for injuries inflicted by a vicious dog, the court said:

> "(W)e are of opinion that notice to one of the joint owners of the vicious propensities of an animal which is being kept and harbored jointly by them is notice to all, and, coming to consider the verdict upon the evidence, we do so with this rule in mind and giving it effect." *Id.* at 324.

It is generally held that notice to the wife of the vicious propensities of a dog which she and her husband kept jointly at their home is notice to the husband. *Perazzo v. Ortega,* 32 Ariz. 154, 256 Pac. 503; *Smith v. Royer,* 181 Calif. 165, 183 Pac. 660; *Ayers v. Macoughtry,* 29 Okl. 399, 117 Pac. 1088; *Benke v. Stepp,* 199 Okl. 119, 184 P. 2d 615; *Halm v. Madison,* 65 Wash. 588, 118 Pac. 755.

The knowledge required to hold the owner of an animal, possessed of vicious characteristics, responsible for injuries inflicted on another, need not be intimate personal knowledge. "Scienter may be sufficiently established by proof of knowledge on the part of those to whose care and management animals are intrusted, as such knowledge is in law imputable to the owner." *Benke v. Stepp, supra* at 123, 184 P. 2d at 619. Furthermore, notice to an agent, within the scope of his employment, is notice to the principal.

> "Knowledge of the agent in reference to the matters of his agency, is the knowledge of his principal. This is a general principle in law, and applies to the owner of a vicious animal which

he has committed to the care, control and agency of another, as well as to other matters in which an agent is employed." *Corliss v. Smith,* 53 Vt. 532, 535.

*Accord, Gooding v. Chutes Co.,* 155 Calif. 620, 102 Pac. 819 (defendant's camel, known to its employee to be vicious, bit plaintiff; defendant held liable.); *Barber v. Hochstrasser, supra; Liberman v. Drill,* 94 N.J.L. 387, 110 Atl. 694 (notice to son, who drove father's wagon, that horse was vicious; held, notice to the father); *Benke v. Stepp, supra; Harris v. Carstens Packing Co.,* 43 Wash. 647, 86 Pac. 1125 (knowledge of driver of a vicious range steer imputed to defendant-owner).

In *Stapleton v. Butensky,* 188 App. Div. 237, 177 N.Y. Supp. 18, defendant was held liable for injuries inflicted by his horse, since "the jury was warranted in inferring that a horse thus manifesting this vicious propensity would also manifest it about the stable and on the occasions when he was under the observation of the owners or their servants, and that in the exercise of proper care they would have discovered it." In *Brice v. Bauer,* 108 N.Y. 428, 15 N.E. 695, the owner of a dog was held liable to the plaintiff, who was bitten by it. The dog had previously bitten one of the servants to whose care the dog was entrusted. The court said, "It is not material that the fact was not communicated to the master." *Id.* at 697. In *Clowdis v. Fresno Flume & Irrigation Co.,* 118 Calif. 315, 50 Pac. 373, the defendant's bull injured the plaintiff while its employees were driving it along a county road. The court said that knowledge of its ferocious disposition by the servant to whom an animal is entrusted is knowledge of the master and is sufficient to render the latter liable.

Radford was not only a joint keeper of the deer with Mrs. Tillett, he was also an agent to whose care she entrusted the deer. His knowledge of the deer's vicious propensities was, therefore, imputed to her. Her individual motion for nonsuit was properly overruled. The motion made in her representative capacity as administratrix, however, should have been allowed. The applicable law was succinctly stated, and authorities collected, by Ervin, J., in *Brown v. Estates Corp.,* 239 N.C. 595, 602-3, 80 S.E. 2d 645, 651-2:

> "As a general rule, the estate of a decedent cannot be held liable for torts which an administrator or an executor commits in administering the estate. In consequence, an action will not ordinarily lie against an administrator or an executor in his representative capacity for such torts . . . (citations omitted) . . . The rule is subject to this exception: Where the estate of a decedent actually receives assets acquired by an administrator or an executor by a tortious act, the party wronged

thereby and entitled to such assets may hold the estate responsible to the extent of the value of such assets. . . . An administrator or an executor is personally liable for his own torts even though they are committed in the administration of the estate."

See Annot., Liability of estate for torts of executor, administrator, or trustee, 44 A.L.R. 637 (1926); 127 A.L.R. 687 (1940).

If not entitled to a nonsuit, defendants contend that they are entitled to a new trial for the exclusion of their proffered evidence relating to the habits or propensities of wild deer. Defendants' theory — and their defense — is that the animal which injured plaintiff, if a deer, was a wild deer; that their deer could not have been the culprit because he was never out of his pound. In order to contradict plaintiff's statements that "a wild deer won't run you," "won't go in a house," and "will run the minute he smells you," defendants offered the testimony of Mrs. Tom Beacham that she had been chased by a big wild buck when she attempted to run him and several does out of her front yard. Plaintiff's statements with reference to the habits of wild deer were made on cross-examination in an attempt to refute defendant's suggestion to her that the deer which had attacked her was not the Tillett deer but a wild buck. Obviously, if wild deer *never* attack humans, it was not a wild deer which had injured plaintiff. We hold, therefore, that it was material and competent for defendants to show that wild deer do, on occasions, attack people. How better to do this than by the evidence of one who herself had been attacked by a wild deer? The exclusion of Mrs. Beacham's proffered testimony was prejudicial error.

The State Wildlife Protector for Dare County, Foster Forbes, who had observed deer, both tame and wild, in Dare County for five years, was sworn as a witness for defendants, who propounded the following questions to him:

1. "Q. Have you an opinion satisfactory to yourself as to whether or not only a tame deer will, under given circumstances, attack or attempt to attack a human being?

"A. Yes.

2. "Q. Will you please express that opinion?
   Objection — Sustained — EXCEPTION #10.
   (If permitted, witness would have answered: 'I will say under given circumstances one is as apt to attack as the other.')

3. "Q. Based on your training, knowledge, observation and

experience of deer, have you an opinion satisfactory to yourself as to what would be indicated if a deer were frothing at the mouth?

"A. Yes.

4. "Q. Please give us that opinion?

Objection — Sustained — EXCEPTION #11.

(If permitted, the witness would have answered: 'Probably it would be from being chased by dogs and extensive running or overheating, and probably rabies or something like that.')"

A witness qualified to speak on the subject may testify as to the habits of animals whether *feræ naturæ* or *domitæ naturæ*. *Congress and Empire Spring Co. v. Edgar*, 99 U.S. 645, 25 L. Ed. 487. In that case, expert witnesses, called by the plaintiff, gave it as their opinion that the male deer in the fall of the year is a dangerous animal. On appeal, it was contended that the plaintiff's "experts" had not been properly qualified. To this the court said, "Even if the witnesses are not properly to be regarded as experts, the court is of the opinion that the testimony was properly admitted as a matter of common knowledge."

In 7 Encyclopaedia Britannica, Deer, p. 165 (1965), we find the following:

"Most deer are shy and furtive although the larger species are dangerous opponents and should not be approached closely even when tamed.

"Especially in the rutting season deer are likely to be unpredictable. . . . Deer attack with either antlers or hooves, impaling with the former and slashing with the latter."

Although we are not prepared to take judicial notice of the habits of deer, we think any person having this special knowledge may testify concerning their characteristics and reactions just as to any other fact within his knowledge. In *Forsythe v. Kluckhohn*, 161 Iowa 267, 142 N.W. 225, the court approved the admission of testimony by "witnesses claiming experience or expert knowledge" of bull terriers as to the effect a muzzle was likely to have upon dogs of that breed and also as to their disposition and characteristics. See *Shelby Iron Co. v. Morrow*, 209 Ala. 116, 95 So. 370; *Clinton v. Howard*, 42 Conn. 294; *Roman v. St. Louis and S. F. Railway Co.*, 120 Kan. 585, 245 Pac. 115. See also *Jeffords v. Waterworks Co.*, 157 N.C. 10, 72 S.E. 624.

"The conduct or habits of animals, and the conditions or emotions of which they are in whole or in part a reaction may

be stated in a shorthand way, by one who has observed them, although they were not observed under the same conditions as existed at the time in question." 32 C.J.S., Evidence § 546(8) (1964).

The grounds for plaintiff's objection to the excluded questions and answers of Mr. Forbes do not appear in the record. The second question, as well as the answer to it, was based upon an assumption of "given circumstances," which were not explained. The ambiguity of the question justified the court's ruling. The fourth question called for an opinion requiring expertise in the physiology of deer and was therefore "the exclusive province of the expert." Stansbury, N. C. Evidence § 132 (2d Ed. 1963). Mr. Forbes was not tendered as an expert and apparently his Honor thought that he had not been sufficiently qualified. The exclusion of this opinion, therefore, was not error. Its admission, however, likewise would not have been error. *Teague v. Power Co.,* 258 N.C. 759, 764, 129 S.E. 2d 507, 511.

Because of the exclusion of the testimony of Mrs. Beacham, there must be a

New trial.

PLESS, J., dissenting: The evidence upon which the son of a recently widowed mother is held to be a "keeper" of the deer is (1) he visited her daily (2) he helped her with her chores, including sometimes feeding the deer (3) so did his children (4) he spoke of it as "my" or "our" deer.

He lived a half mile from his mother and had never kept the deer at his home.

I believe the result penalizes a son who does nothing more than a dutiful child should do for his bereaved mother.

I dissent.