[No. A061366. First Dist., Div. Five. Apr. 26, 1994.]

SEA HORSE RANCH, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF SAN MATEO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Cooper, Arguedas & Cassman and Ted W. Cassman for Petitioners.

No appearance for Respondent.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Richard Rochman, Deputy Attorneys General, for Real Party in Interest.

**OPINION**

**HANING, J.**—Petitioners Sea Horse Ranch, Inc. (the Ranch), and its president, Arbis "Al" Shipley, are charged by information with one count of involuntary manslaughter (Pen. Code, § 192, subd. (b)); the Ranch is also

charged with one count of willfully suffering a mischievous animal to roam at large with the result that it kills a human being (Pen. Code, § 399).[1] The charges arise from an incident in which a horse escaped from the Ranch onto an adjacent state highway and collided with a car, killing the passenger. Petitioners moved to dismiss the information under section 995. The superior court denied the motion in substantial part, and petitioners seek writ review.

We initially summarily denied the petition, primarily for petitioners' failure to provide an adequate record. (See *Sherwood* v. *Superior Court* (1979) 24 Cal.3d 183, 186-187 [154 Cal.Rptr. 917, 593 P.2d 862]; Cal. Rules of Court, rule 56.)[2] Petitioners sought review in the Supreme Court, which allowed them to complete their record in that court and then granted review. The Supreme Court returned the matter to this court with directions to issue the alternative writ. Having done so, having reviewed a record which was not previously submitted to us, and having heard oral argument, we deny the petition as to the manslaughter charge, but grant relief on the charge of keeping a mischievous animal.

## FACTS

On March 23, 1992, well after 7 p.m., an automobile struck a horse that was running free on coastal Highway 1 in Half Moon Bay. The passenger in the car, 76-year-old Viola Scheutrum, was killed when the impact with the horse crushed the roof of the passenger compartment. The accident occurred directly in front of the main driveway of the Ranch. It was after dark, there were no streetlights and the highway was poorly lit.

An officer responding to the scene noticed no less than eight horses running free on the highway. They were not ambling, but running at a "trot[ ] to a gallop." The horses were dark brown, and were not picked up in the officer's headlights. The officer could not see the horses until he activated his red and blue strobe-light flashers.

The petition's assertion that "the prosecution presented no evidence suggesting that . . . [petitioner] Shipley . . . knew of the allegedly inadequate condition of the corral fence[,]" is misleading. Chuck Bunce, the Ranch's foreman, told the officer that all the horses on the highway belonged to the Ranch. The officer met with petitioner Shipley, who told the officer the horses had escaped through the corral fence on the west side. One Kevin

---

[1]All further statutory citations are to the Penal Code unless otherwise indicated.
[2]All further rule references are to the California Rules of Court.

Shipley, presumably related to petitioner Shipley, took the officer to an area of the corral fence on the western part of the Ranch, and identified it as the place where the horses got free.

The fence posts were old, weather-worn, bug-infested and rotting. Several cross boards had been knocked off the posts where the wood was rotten, leaving a hole in the corral fence. The nails which had attached the cross boards were not in good condition. The boards were broken out from the inside, with no sign of vandalism. The fence was so dilapidated that when the officer leaned on a cross board, it fell off. The cross boards were mounted improperly on the outside of the fence posts, making them more easily pushed out by animals on the inside. Contrary to common practice, there was no wire strung along the inside of the fence to keep horses away from the cross boards. Neither was there any electrical wire around the inside of the corral. The Ranch had not erected a fence along the front boundary with Highway 1 to keep the horses off the highway. The Ranch's border with the highway was not well-lit.

Although petitioners vigorously dispute the point, the Ranch has a history of horses escaping. An investigating officer, Detective Wendy Bear, testified that Bunce told her the horses had broken down the fence in the past and had escaped. Bear also testified that Mr. Jaycea Caudle, who lived on the Ranch premises, told her equine escapes were a "frequent occurrence." Petitioners objected to this evidence as hearsay; the court overruled the objection subject to a motion to strike. Caudle later testified as a defense witness and denied that he had personal knowledge of horses escaping The motion to strike was not made, and petitioners' own counsel solicited from Bear on cross-examination that Caudle had told her that escapes became more frequent after petitioner Shipley took over the Ranch, and that horses had escaped "more times than [Caudle] could count."

The People also presented evidence suggesting that the Ranch's horses escaped onto Highway 1 on several previous occasions. These prior escapes are presented with some detail in the petition, which assaults the evidence as not probative. The petition overlooks the point that the evidence was presented at the preliminary hearing, where the standard of proof is probable cause. The evidence established that large groups of horses were running free on Highway 1 on four occasions in 1991 and early 1992, in the vicinity of the Ranch. On one of those occasions Bunce told the police he would take care of the horses; on another, petitioner Shipley told the police he "would need to look to see [sic] for the horses." On this latter occasion petitioner Shipley was cited by the humane society for having horses loose on the highway.

## Procedural Background

The preliminary hearing was held October 22, 1992. At the conclusion thereof the matter was continued until December 29, 1992, "so that the parties could brief the merits." At the December 29 hearing the parties argued whether a holding order should issue. When the petition was initially filed, we were not provided with copies of the posthearing briefs, or of the transcript of oral argument when petitioners were held to answer. "In the absence of a transcript the reviewing court will have no way of knowing in many cases what grounds were advanced, what arguments were made and what facts may have been admitted, mutually assumed or judicially noticed at the hearing." (*Lemelle* v. *Superior Court* (1978) 77 Cal.App.3d 148, 156 [143 Cal.Rptr. 450].) At the conclusion of oral argument the magistrate held both petitioners to answer to the charge of involuntary manslaughter, but declined to hold them to answer to the violation of section 399.

The People refiled both charges against both petitioners in the information. Petitioners moved to dismiss under section 995. The superior court granted the motion as to petitioner Shipley on the section 399 charge only, on the theory that the section applied to the owner of an animal and the horses were owned by the Ranch as a corporation, not by petitioner Shipley as an individual. In all other respects the motion was denied.

Petitioners sought review in this court by a petition for writ of prohibition. (§ 999a.) The petition was not accompanied by the posthearing briefs or the transcript of the final hearing in the municipal court; likewise, the petition did not include the reporter's transcript of the hearing on the section 995 motion in superior court.

The importance of a transcript cannot be understated, as indicated in the passage from *Lemelle*, quoted above. Furthermore, in the case of a preliminary hearing, a reporter's transcript is necessary to determine whether the magistrate made factual findings under *Jones* v. *Superior Court* (1971) 4 Cal.3d 660 [94 Cal.Rptr. 289, 483 P.2d 1241], which would bind this court as well as the superior court. (*Id.*, at p. 667.)

Despite the fact that both *Lemelle* and *Sherwood* have been the law for several years, and despite the fact that rule 56 spells out the need for a transcript in no uncertain terms, all too often writ petitions arrive absent this crucial component of the record. Fairly often, as was the case here, the petition recites that the transcript will be filed contemporaneously with the petition, but the transcript never arrives. Given the vast volume of petitions for extraordinary writs and the need for a prompt decision—such as where,

as here, a petition seeks a stay of an imminent felony trial—this court is not in the habit of holding petitions until errant transcripts find their way to the courthouse, absent the requisite declaration from counsel informing us when the transcript was ordered and when it is expected to arrive. (Rule 56(c)(4).)

Accordingly, we summarily denied the petition with citation to *Sherwood* and rule 56(c)(4). In his *unverified* petition for review, petitioners' counsel stated that his "messenger inadvertently failed to file" a copy of the transcript. Counsel requested the Supreme Court to consider the transcript under rule 28(e)(6).[3] The court did so, and granted review. Rather than transfer the matter to this court for reinstatement and reconsideration of the merits on a complete record, the court directed us to issue an alternative writ. At this juncture the record was still incomplete due to the absence of the municipal court briefs and transcript discussed above. However, since the Supreme Court directed us to issue an alternative writ, apparently despite petitioners' lack of compliance with rule 56, we allowed counsel to submit the transcript following oral argument. We assume the Supreme Court did not intend that we deny relief solely on the basis of noncompliance with rule 56. As it turns out, the missing transcript is significant in our ultimate decision.

DISCUSSION

I

*Introduction*

█ Petitioners contend they should not be found criminally liable for the behavior of the escaped horse. They argue that the People presented no evidence that the corporation or its president could be held liable for involuntary manslaughter based on a theory that the condition of the corral fence which permitted the horses to escape constituted "criminal negligence." They also contend that a horse is not a "mischievous animal" within the meaning of section 399.

█ We begin with the established rules of review. At the preliminary hearing the People need show only reasonable or probable cause, i.e., a state of facts under which a person " ' "of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused." ' " (*Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 474 [62

---

[3]Rule 28(e)(6) provides in part that a petition for review may include "any evidentiary exhibit . . . that counsel considers of unusual significance . . . ." The rule's wording implies that such exhibits may be considered by the Supreme Court even though they were not before the Court of Appeal.

Cal.Rptr. 581, 432 P.2d 197].) In reviewing a denial of a section 995 motion to dismiss, an appellate court must draw every legitimate inference from the evidence in favor of the information. (67 Cal.2d at p. 474.) If there is some evidence to support the information, we may not inquire into its sufficiency. (*Ibid.*)

## II

### *Involuntary Manslaughter*

#### A

■ The offense of involuntary manslaughter requires proof that a human being was killed and that the killing was unlawful. (CALJIC No. 8.45.) A killing is "unlawful" if it occurs (1) during the commission of a misdemeanor inherently dangerous to human life, or (2) in the commission of an act ordinarily lawful but which involves a high risk of death or bodily harm, and which is done "without due caution or circumspection." (*Ibid.*) Involuntary manslaughter contemplates "negligent acts which are aggravated, reckless and gross and which are such a departure from what would be the conduct of an ordinarily prudent, careful person under the same circumstances as to be contrary to a proper regard for human life [or] danger to human life or to constitute indifference to the consequences of such acts. . . ." (CALJIC No. 8.46.)

Such criminal negligence is of a higher order of culpability than ordinary civil negligence (*People* v. *Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926]) and is measured objectively: if a reasonable person would have been aware of the risk, the defendant is presumed to have had that awareness. (See *Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 136-137 [253 Cal.Rptr. 1, 763 P.2d 852].)

■ Petitioners only briefly address the threshold issue of whether the condition of the corral fences amounts to criminal negligence on *anyone*'s part. Indeed, petitioners almost assume that there is criminal negligence in this case, and simply argue that petitioner Shipley was not guilty thereof. Petitioners' strategy seems to be to focus on their alleged lack of knowledge or awareness of the condition of the fence, stressing that petitioner Shipley is the president of the corporation and is presumably not involved with its daily operations. Relying on Bunce's testimony that fence maintenance and repair was his responsibility as foreman, petitioners seem to implicitly argue that even if Bunce (or some other corporate employee) was criminally negligent, they were not.

This may be a reasonable tactic, but it fails to answer whether criminal negligence is involved herein at all. In 18 lines of argument petitioners simply quote the general law of criminal negligence set forth above, and proceed to the next step of their argument. The People, on the other hand, make the not unreasonable argument that under the circumstances of this case, the apparent long-standing disrepair of the fence and the escapes of the horses amount to criminal negligence. The People note the extremely dilapidated condition of the fence; the improper construction of the fence; the failure to follow the common practice of installing some kind of wire to keep the horses away from the fence; the failure to have a "fallback" measure of a perimeter fence on the border with the highway to keep horses off the road; and the fact that the horses were continually escaping near a busy highway.

The People then put these omissions in context: "These mistakes might not have been so damning had the Ranch not been so close to a major thoroughfare or had it not kept animals as large as horses. Here, however, the Ranch abutted Highway One, a road with a 50 mph speed limit and without any street lighting. Moreover, it [was] not possible to see the horses on the road without special lights." When one factors in the numerous previous escapes of horses onto the highway, the People's argument is not unsound. The condition of the fence, the keeping of large animals near a poorly lit highway, and the prior escape problems can give rise to an awareness that these factors were creating a high risk of harm in disregard of human life and safety, particularly to motorists on the highway.

We stress here the history of the prior horse escapes at the Ranch. We are not dealing with an isolated occurrence of a headstrong animal finding its way to a highway and causing harm. We are not dealing with a hapless horse owner facing criminal liability for the first time an equine escapes its fold. The facts of this case, as presented at the preliminary hearing, show that the Ranch has a substantial history of horses escaping. This key fact, coupled with the condition of the fence and its proximity to a major highway, is sufficient to establish probable cause that criminal negligence occurred.

We asked the parties to brief the applicability, if any, of Food and Agricultural Code section 16904 and *Pepper* v. *Bishop* (1961) 194 Cal.App.2d 731 [15 Cal.Rptr. 346]. The statute provides that "[i]n any civil action which is brought by the owner, driver, or occupant of a motor vehicle . . . for damages which are caused by collision between any motor vehicle and any domestic animal on a highway, there is no presumption or inference that the collision was due to negligence on behalf of the owner or the person in possession of the animal." *Pepper*, construing the statute's almost identically worded predecessor, held that the statutory language only precludes

application of the doctrine of res ipsa loquitur. (*Id.*, at pp. 733-734.) In other words, the mere fact of the collision does not give rise to the presumption of negligence. In the case now before us, the People are not relying on the mere fact of the collision alone, but on a host of factors indicating negligence, including the condition of the corral fence and the notice afforded by the prior history of escapes.

We also note, as the People have pointed out, that the owners of livestock have a statutory duty to take reasonable steps to keep their animals from wandering on highways. Food and Agricultural Code section 16902 provides that "[a] person that owns or controls the possession of any livestock shall not willfully or negligently permit any of the livestock to stray upon, or remain unaccompanied by a person in charge or control of the livestock upon, a public highway, if both sides of the highway are adjoined by property which is separated from the highway by a fence, wall, hedge, sidewalk, curb, lawn, or building." The record is unclear as to whether Highway 1 near the Ranch is "adjoined . . . by a fence, wall, hedge, sidewalk, curb, lawn, or building"; if it is so adjoined, we may presume the People will adduce the appropriate proof at trial.

### B

■ Assuming there is criminal negligence in this case, the next question is whether the Ranch, as a corporation, and its president, petitioner Shipley, are criminally liable. This issue comprises the bulk of the briefing. Under the facts of this case, at the probable cause stage at which a reviewing court must draw every legitimate inference in favor of the information, that question must be answered in the affirmative. We emphasize that our discussion of criminal liability is only within the context of probable cause, and not the question of guilt or innocence to be determined at petitioners' trial.

It should be noted at the outset that petitioners concentrate on the criminal liability of petitioner Shipley. There is no separate discussion of the criminal liability of the corporation. The two are not coterminous. ■ In California, a corporation may be criminally liable for the conduct of its officers or agents or employees. (*Granite Construction Co.* v. *Superior Court* (1983) 149 Cal.App.3d 465, 467 [197 Cal.Rptr. 3, 45 A.L.R.4th 1011]; see *W. T. Grant Co.* v. *Superior Court* (1972) 23 Cal.App.3d 284, 286-287 [100 Cal.Rptr. 179].) "California corporations can form intent, be reckless and commit acts through their agents"; the criminal negligence of corporate officers or agents may be imputed to the corporation to support a charge of involuntary

manslaughter. (*Granite Construction Co.* v. *Superior Court, supra*, at pp. 472, 474.) ██ As we discuss below, the criminal negligence in this case is that of petitioner Shipley, the corporate president, presumably acting in the corporation's behalf; Shipley was not a casual or low-level employee with no decisionmaking authority. Thus, Shipley's negligence may be imputed to the corporation. (*Ibid.*; *W. T. Grant Co.* v. *Superior Court, supra*, at pp. 286, 287.)

The liability of petitioner Shipley is a separate question. ██ It is well settled that "[a]n officer of a corporation is not criminally answerable for any act of a corporation in which he [or she] is not personally a participant . . . ." (*Otis* v. *Superior Court* (1905) 148 Cal. 129, 131 [82 P. 853]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 96, pp. 110-111.) In the context of negligent homicide such an officer would be said not to be liable unless he or she was personally aware of the omissions or other behavior that gives rise to the criminal negligence. The decisions involving criminal liability of corporate officers, either expressly or impliedly, focus either on the officer's direct participation in illegal conduct, or his or her knowledge and control of the illegal behavior. The mere fact of the officer's position at the apex of the corporate hierarchy does not automatically bestow liability.

*Otis* held that the president and vice-president of a newspaper corporation were not liable for publication of contumacious articles simply by virtue of their high office. The court stressed that the People had to show that the officers "personally caused, or, being in control, at least permitted, the publication of the articles in question." (*Otis* v. *Superior Court, supra*, 148 Cal. at p. 131.)[4]

Similarly, in *People* v. *International Steel Corp.* (1951) 102 Cal.App.2d Supp. 935, 942-943 [226 P.2d 587], a corporate officer was held criminally liable for violating an antipollution statute where he personally operated the facility which emitted the pollution (fumes from burning auto bodies), and by clear implication had knowledge of the violation. By contrast, the corporate secretary was found not liable; although he had knowledge of the burning operations, he had no control over them. "The secretary of a corporation, merely as such, is a ministerial officer, without authority to transact the business of the corporation upon his [or her] independent volition and judgment. [Citations.]" (*Ibid.*)

In *People* v. *Epstein* (1931) 118 Cal.App. 7, 10-11 [4 P.2d 555], the general manager of a loan and investment corporation was liable for improper use of depositors' funds, where he signed checks and knew of the

---

[4]In another context, we have previously held that one cannot "permit" that of which one is not aware. (See *Laube* v. *Stroh* (1992) 2 Cal.App.4th 364, 377 [3 Cal.Rptr.2d 779].)

misappropriation of the funds. By contrast, in *People* v. *Lieber* (1956) 146 Cal.App.2d Supp. 910, 914-915 [304 P.2d 869], an officer of an incorporated pharmacy was not criminally liable for illegally dispensing a narcotic when there was no evidence he actively participated in the criminal conduct.

More recent decisions are in accord with these older cases supporting the People's position. In *People* v. *Conway* (1974) 42 Cal.App.3d 875, 885-886 [117 Cal.Rptr. 251], the defendant was found liable where he was aware of the false advertising of corporate sales employees, was in a position to control the employees' conduct, and tolerated, ratified or authorized their actions. In *People* v. *Regan* (1979) 95 Cal.App.3d Supp. 1, 4 [157 Cal.Rptr. 62], the court refused to predicate criminal liability on the owner of a business for the conduct of an employee off the premises: "There is nothing in the record which gives any indication that appellant had knowledge of, or participated in, the illegal conduct." In *People* v. *Toomey* (1985) 157 Cal.App.3d 1, 15 [203 Cal.Rptr. 642], liability was imposed on the basis of the knowing participation of the corporate officer.

■ Petitioners claim there is no evidence that petitioner Shipley had any knowledge of the negligence and thus had no direct participation in the offense of manslaughter. They suggest the People seek to impose liability solely based on petitioner Shipley's status as president of the corporation, an impermissible theory of respondeat superior. The People respond that the record supports the reasonable inference that petitioner Shipley had the requisite knowledge and awareness. Extending to the information every legitimate inference, we must agree with the People.

Petitioner Shipley was present at the Ranch soon after the collision and it was *he* who informed the police that his horses had escaped through a hole in the fence. Petitioner Shipley had personal knowledge of prior escapes. Indeed, the transcript of the oral argument in municipal court, absent from the record both when the petition was filed and when it was transferred (see *ante*, pp. 452-453), reveals this conclusion of the magistrate: "It is the view of the court that—first of all, we took into account some evidence . . . as to horses being loose on prior occasions and on some of those occasions Mr. Shipley being present at the scene of their capture or intended capture. [¶] Viewing all those incidences together, I think there are inferences that the court can legitimately draw as to his personal knowledge as to the [horses'] ability to escape to be a public nuisance, and, in effect, a threat to the public."

This is not a case where prosecutors seek to hold the president of a multinational corporation criminally liable for negligence occurring thousands of miles away; the evidence shows petitioner Shipley's presence on

the Ranch's premises on several occasions, and his knowledge of the defective fence and the prior equine escapes. Given that the People needed to show only a reasonable or probable cause to suspect petitioner Shipley's knowledge of the operations of his own ranch, they have met their burden. Again, we stress that petitioner Shipley had prior *actual* notice of the problem of escaping horses.

Indeed, at least one court, in a decision cited with approval in *Conway*, has held that for purposes of establishing probable cause, as opposed to guilt, it can be *inferred* that a corporate president was aware of corporate operations. "The president of a corporation is generally its chief executive officer and it is a fair inference that he [or she] is acquainted with the conduct of the business of the corporation. If the corporation in conduct of its business was [acting unlawfully] there was probable cause to believe that its president knew of [the unlawful conduct] and either procured it to be done, or permitted it to be done, or did nothing to prevent it." (*United States* v. *Laffal* (D.C.Mun.App. 1951) 83 A.2d 871, 872, footnote omitted; quoted in *People* v. *Conway, supra,* 42 Cal.App.3d at p. 886.)[5]

We thus conclude there is probable cause that petitioner Shipley had the requisite knowledge and awareness of the risks created by the Ranch's horses, and thus there is probable cause to suspect him of the criminal negligence necessary for the charge of involuntary manslaughter.[6]

### III

### *Keeping a Mischievous Animal*

The remaining question is whether a horse is a "mischievous animal" within the meaning of section 399. Section 399 provides that "[i]f the owner of a mischievous animal, knowing its propensities, willfully suffers it to go at large, or keeps it without ordinary care, and such animal, while so at large,

---

[5] *Conway* itself has been cited with approval by the Supreme Court, but without explicit discussion of its analysis. (*Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 358 [185 Cal.Rptr. 453, 650 P.2d 328].)

[6] The People also seem to argue that petitioner Shipley's position as corporate president supports criminal liability simply because, as president, he was in a position to control the Ranch's employees. The People extract unfortunately imprecise language from *Conway* out of context. In speaking in terms of a corporate officer being able to control unlawful employee conduct, *Conway* could be read to suggest that control *without knowledge* is sufficient to invoke criminal liability. (*People* v. *Conway, supra,* 42 Cal.App.3d at pp. 885-886.) This reading of *Conway* is too broad.

or while not kept with ordinary care, kills any human being who has taken all the precautions which the circumstances permitted, or which a reasonable person would ordinarily take in the same situation, is guilty of a felony." As noted above, only the Ranch is charged with violation of this statue because it, and not petitioner Shipley, is the owner of the escaped horse.

Petitioners argue that the statute requires the animal possess mischievous propensities per se, and that horses by their very nature are not mischievous. The People respond that the question is whether the animal is mischievous *if allowed to run free*. The People rely on certain language in *People* v. *Berry* (1991) 1 Cal.App.4th 778 [2 Cal.Rptr.2d 416], which discussed and interpreted section 399. The *Berry* court noted the legislative purpose of the statue was "to protect people against fatal attacks . . . where the victim is in no way at fault for the attack. [Citation.]" (1 Cal.App.4th at p. 783.) "In seeking to protect people from fatal attacks by 'mischievous' animals, section 399 implies that a 'mischievous' animal is one that may be dangerous to other *if allowed to run free* . . . ." (*Id.* at p. 786, italics added.)

The People misinterpret *Berry*, which incidentally involved a pit bull dog and not a more benign member of the animal kingdom. *Berry* assumed that the danger from the animal when allowed to run free sprang from the nature of the animal itself, not simply its freedom. A "mischievous" animal must be such in the abstract: the very nature of the beast, as it were, puts the owner on notice that it must be confined lest it injure others. A benign animal such as a horse or sheep or cow may cause injury should it escape; it may also find the nearest child and lick its hand. To hold that any animal is "mischievous" within the meaning of the statute just because it escapes, and without consideration of its behavioral propensities, would be untenable.

Cases from other jurisdictions are in accord. For instance, *Scott* v. *Dunn* (Ala. 1982) 419 So.2d 1340, 1344, holds that animals are not made "mischievous" by the mere fact of their roaming free. " 'Mischievous propensities' of an animal are its tendencies to bite, kick, gore, etc., not its tendencies to walk on a highway." (*Ibid.*) With regard to tort liability for keeping mischievous animals, most jurisdictions follow the rule that ". . . animals which have become domesticated by man, such as horses, cows, dogs, et cetera[,] . . . are regarded as inherently safe." (*Rolen* v. *Maryland Casualty Company* (La.Ct.App. 1970) 240 So.2d 42, 44, overruled on other grounds, *Holland* v. *Buckley* (La. 1974) 305 So.2d 113, 114, 117.) Wild animals are considered inherently dangerous; a domesticated animal is only classified as mischievious if its individual behavior demonstrates viciousness. (*Ibid.*;

*Swain* v. *Tillett* (1967) 269 N.C. 46 [152 S.E.2d 297, 301]; see generally Annot., Owner's or Keeper's Liability for Personal Injury or Death Inflicted by Wild Animal, 21 A.L.R.3d 603, 627-628.) The tendency of livestock to roam or stray if not contained is well known. This is a natural or inherent trait, not a mischievous one.

## DISPOSITION

Let a peremptory writ of prohibition issue restraining respondent superior court from taking any action on the charge of violating section 399 except to dismiss it. In all other respects, the petition for writ of prohibition is denied.

Peterson, P. J., and King, J., concurred.

A petition for a rehearing was denied May 18, 1994, and petitioners' application for review by the Supreme Court was denied July 21, 1994.